## Case No. 55.

ADAMS v. The ISLAND CITY.

[1 Cliff. 210.][1]

Circuit Court, D. Massachusetts. May Term, 1859.

SALVAGE — CONTRACT — COMPENSATION — PLEADING.

1. In order to bar a claim for salvage there must be a distinct agreement proved between the parties for a given sum, to be paid whether the property be lost or not. It is quite immaterial whether the salvors accidentally fall in with the wreck and volunteer their services, or are called upon by the owners or persons interested to aid in saving it.

[Cited in The Louisa Jane. Case No. 8.532; Baker v. Hemenway. Id. 770: and in Chapman v. The Greenpoint, 38 Fed. Rep. 671.]

2. The mere fact that a libellant alleges his claim to be "in a cause of contract civil and

[1][Reported by Hubert A. Banning, Esq., and Henry Arden, Esq., and here reprinted by permission.]

[1][Reported by William Henry Clifford, Esq., and here reprinted by permission.]

maritime, and for extra services rendered" to the vessel libelled and her crew, will not prevent such claim from being regarded as one for salvage, if it appears, from the general scope of the several allegations of which the libel is composed, that such is in reality the character of the claim.

3. Where three sets of salvors at different times rendered services to a vessel during a continuous peril, each was held entitled to compensation, although the separate service of either would not alone have saved the vessel in distress.

[Cited in The Mayflower v. The Sabine, 101 U. S. 387.]

4. Where three sets of salvors contributed in rescuing a vessel from peril, which vessel with her cargo was valued at $70,000, the joint value of the several vessels engaged being $131,000, and the whole time employed some fifteen days, the amount of salvage decreed to all the salvors was $13,000, of which sum $5,200 was decreed to the libellants in this case, it appearing that their vessel was worth $85,000, and that she was employed some thirteen days in the service.

[See note at end of case.]

[In admiralty. Libel for salvage. Decree for libelants.]

This was a suit in admiralty, in a cause of contract civil and maritime, and of extra services rendered by the steamer R. B. Forbes to the bark Island City and her crew; and was removed into this court pursuant to the act of the 3d of March, 1821, on the certificate of the district judge that he was so concerned in interest as to render it improper for him, in his opinion, to hear the cause. The bark Island City left Galveston on the 10th of December, 1856, laden with cotton and hides, and bound on a voyage to Boston. She made Cape Cod on the 18th of January, 1857, in a snow-storm, when the master, finding that he could not get by the cape, kept off, and ran into the Vineyard sound, and, at four o'clock in the afternoon, anchored within six miles of Bass river. At ten o'clock in the evening, finding that his ground-tackle would not hold, he cut away the masts, and at daylight next morning found himself near the Horse Shoe. One anchor was gone; but the master supposed the other was still attached to its cable. On the morning of the 19th the gale began to diminish, and the bark remained without material change till the evening of the 21st, when she was hailed by the schooner Kensington. The Kensington was requested to tow the bark into Hyannis, when it was discovered that the bark's other anchor was gone. The bark was taken in tow by the schooner, and they proceeded about three miles toward the harbor of Hyannis; then, at eleven o'clock, bent another anchor to the chain, and came to anchor, on account of there being no wind. At one o'clock, on the morning of the 22d, finding it was commencing to snow, and the wind increasing, they got up the anchor, and proceeded about eight miles toward the harbor; but at four o'clock were obliged to anchor again, on account of the ice and the severity of the

weather. At seven o'clock they again got up the anchor, when the bark drifted astern and the hawser parted, and efforts to again make fast proved fruitless. At eight o'clock the bark came to anchor in four and a half fathoms of water, with a hundred fathoms of chain out; and the schooner left her, with an agreement to telegraph to her owners in Boston, and to return. The despatch was sent; but the schooner was unable to return, on account of the ice and severe weather. Upon receipt of the intelligence contained in the despatch the owners of the bark sent the steamer R. B. Forbes to her relief; and on the 23d of January she was found where she had been left by the schooner. The steamer took the bark in tow, and proceeded toward Hyannis till about dark, when both vessels came to anchor about a mile outside of the harbor. At daylight the next day, finding it impracticable to get into Hyannis, on account of the ice, it was decided to go to Provincetown to procure a supply of provisions and coal. After having towed the bark about nine miles toward Provincetown it was found the steamer could make no headway against the tide and ice, and both vessels came to anchor. Six hours later the anchors were got up, and the steamer, with the bark in tow, started to make the east channel, and towed all night. Monday morning, the 26th of January, at six o'clock, both vessels grounded on Great Point, in the northerly part of Nantucket, and there remained about two hours, till the tide rose, when they floated off, and the steamer again commenced towing the bark. In consequence of the quantity of ice, but little progress was made; and it was finally concluded that there was not sufficient coal on board the steamer to enable her to get the bark to Provincetown. The bark was anchored, and the crew went on board the steamer, which proceeded to Provincetown to procure a supply of provisions and coal, intending to return the following morning. On reaching Provincetown it was found that no supply of suitable coal could be obtained until the following Friday, when a quantity arrived from Boston. As soon as the coal was placed on board, the steamer started for the bark, and reached the place where she had been anchored about eight o'clock on Saturday, but found that she was gone. Saturday was spent in search of the bark, and on Sunday she was found at Hyannis, in possession of the officers and crew of the steamer Westernport, who claimed salvage compensation for bringing her into Hyannis; and who alleged that the Westernport, on the 30th of January, while on a voyage from New York to Boston, discovered the bark, dismasted and apparently deserted, whereupon she changed her course and bore down for the bark, which was, after great difficulty, boarded and found abandoned,—having out an anchor weighing only eight hundred pounds, the

chain not fastened on board, nearly all paid out and constantly rendering around the windlass; that, after twenty-four hours' labor and exposure, the bark was brought safely into the harbor of Hyannis; they also alleged that the steamer was in peril by coming in contact with the bark. On Tuesday, the 3d of February, the master of the Forbes, having received intelligence that the owners of the bark had given bond to pay such legal claim, if any, as the Westernport might justly have demanded, took possession of the bark, and arrived with her in Boston harbor, February 6th. Libels were filed by the owners of the R. B. Forbes, by those who were on board the schooner Kensington, and the owners of the steamer Westernport.

[The owners of the Westernport appealed to the supreme court from a decree forfeiting their interest in the salvage for misconduct, and that decree was affirmed.]

J. D. Bryant, proctor for libellants.

The assistance rendered to the bark is to be regarded as an entire one, and as such constitutes a salvage service. The assistance rendered by the Kensington, taken by itself alone, did not constitute a salvage service. It must be successful, and by it the vessel assisted must be taken from danger to safety. The India, 1 W. Rob. 408; The Dodge Healy, [Case No. 2,849;] Hand v. The Elvira, [Id. 6,015;] The Emulous, [Id. 4,480;] The Henry Ewbank, [Id. 6,376;] The Independence, [Id. 7,014.] The Westernport could only come in as a salvor, if at all, by engrafting her service on that previously rendered by the Kensington and the R. B. Forbes.

1. What shall the compensation be for this service? 2. How shall the compensation be divided among the different libellants?

1. As to the elements to be considered in fixing compensation. The Wm. Beckford, 3 C. Rob. [Adm.] 355; The Clifton, 3 Hagg. [Adm.] 121; The Industry, Id. 204; The Traveller, Id. 370; The Boston, [Case No. 1,673;] The Versailles, [Id. 16,924;] The Sarah, 1 C. Rob. [Adm.] 312, note; The Hector, 3 Hagg. [Adm.] 95.

2. The fact that the Forbes went to the assistance of the bark, at the request of her owners, introduces no different rule as to her compensation. The Wm. Lushington, 7 Notes of Cas. 361; The Centurion, [Case No. 2,554;] The H. B. Foster, [Id. 6,290;] Bearse v. Three Hundred and Forty Pigs Copper, [Id. 1,193.]

The Forbes took the bark from a place of danger. As to higher rate of compensation for salvage service rendered by steamers than by sailing vessels. The Raikes, 1 Hagg. [Adm.] 246; The Adventure, 3 Hagg. [Adm.] 153; The London Merchant, Id. 395; The Perth, Id. 415. When steamers go out of port for the express purpose of rendering aid. The Graces, 2 W. Rob. [Adm.] 294; The Pickwick, 20 Eng. Law & Eq. 630. The Island City was not derelict when found by the Westernport. Tyson v. Prior, [Case No. 14,319;] The Aquila, 1 C. Rob. [Adm.] 41; The Beaver, 3 C. Rob. [Adm.] 293; The Barefoot, 1 Eng. Law & Eq. 661; The Bee, [Case No. 1,219;] Rowe v. Brig ——, [Id. 12,093;] The Boston, [Id. 1,673.] The services of the Westernport were not needed and were not rightly undertaken. The law is jealous in maintaining the rights of original salvors. The Charlotta, 2 Hagg. [Adm.] 364. The right of possession once obtained was not lost by temporarily leaving the wreck. The Amethyst, [Case No. 330.] See The India, 1 W. Rob. [Adm.] 408. In order to justify the interference, the Westernport must show an absolute necessity therefor. Hand v. Elvira, [Case No. 6,015;] The Maria, Edw. [Adm.] 177; The Blenden Hall, 1 Dod. 418.

B. R. Curtis and William Dehon, for claimants.

CLIFFORD, Circuit Justice. All the evidence tends to show that the peril was continuous from the first moment, when the schooner went to the relief of the bark, down to the time when the steamer Westernport anchored her in the port of Hyannis, in a condition so crippled and disabled by the disaster she had encountered that the service of the other steamer was indispensable to get her into Boston, where she was bound. She was in very great peril when relieved by the schooner, and was by her placed in a position of far less exposure. Those on board the schooner were prevented from doing more by the violence of the storm, and from returning to complete the service, by causes beyond their control. They rendered important service in changing her position, and in transmitting intelligence to her owners, and in giving them the opportunity of sending forward more efficient aid. Valuable services were also rendered to the bark by the steamer R. B. Forbes, in placing her in a position of still greater safety, where, if her only remaining anchor had been of sufficient weight, there is much probability she might have ridden out the storm, till the steamer with her own crew had returned. Her exposure, however, was still very considerable, considering the state of the weather, on account of the well-established fact that the anchor was not of sufficient weight. Two of her anchors had previously been lost, and the one remaining was the stream anchor, weighing but eight hundred pounds, which, in view of the size of the vessel and her lading, was clearly insufficient to justify the conclusion that the bark was out of danger in the rough weather which followed. Floating ice still remained in the Sound, and for a considerable portion of time there was a heavy sea. Under those circumstances she was certainly liable to have drifted away, during the gale of the succeeding night. While these considerations lead necessarily

to the conclusion that the Westernport rendered valuable service to the bark, it by no means follows that the bark was derelict, as is contended by the counsel for that steamer. On the contrary, it appears that the steamer R. B. Forbes left the bark where the steamer found her, with the intention of returning, and the same remark applies to the crew of the bark, and it is not perceived, from the evidence, that the officers and crew of the steamer omitted any precaution in their power to take to leave the vessel in a safe position, or that they were guilty of any negligence in their efforts to return. Their right to salvage compensation is resisted by the counsel of the Westernport upon two grounds, which may as well be considered at the present time as in any other stage of the controversy.

It is said, in the first pla e, that the service was rendered under contract with the owners of the bark, and therefore was not a salvage service. Intelligence was communicated to the owners of the bark, by the master of the schooner on his return to Hyannis, that the bark was still in peril, and needed assistance. He performed that service at the request of the master of the bark, and the result was that her owners immediately telegraphed to Provincetown, where the steamer was then lying, requesting her master to go to the relief of the bark, and in pursuance of that request he went, and found her where she had been left by the schooner. No contract of any kind was made between the parties, except what may be implied from that request, which created no more obligation upon those on board the steamer to undertake the service than a signal of distress from the bark would have created, if it had been seen from the shore. They were at perfect liberty to go or to decline to go, as they saw fit, and if they had refused, either from interest or choice, the owners of the bark would have no right of action on account of the refusal. Such a service is entitled to be rewarded under the conditions and according to the measure of the maritime law; as the claim stands upon the request of the master of the steamer to go to the assistance of the bark, a compliance with that request, and the performance of a service which is salvage in its incidents and nature. All the cases show that the relief of property from an impending peril of the sea, by the voluntary exertions of those who are under no legal obligations to render assistance, and the consequent ultimate safety of the property from such peril, constitutes a case of salvage; and where the compensation is not fixed by such a contract as a court of admiralty will enforce, it is to be adjusted according to those liberal rules which form a part of the maritime law. In order to bar a claim for salvage, there must be a distinct agreement proved between the parties for a given sum. It is quite immaterial whether the salvors accidentally fall in with the wreck and volunteer their services, or are called upon by the owners or persons interested to aid in saving it. It is the place where the property is situated, and the circumstances of exposure and peril, which determine the question whether or not the case is one of salvage; and it has been determined that, to bar a claim of this description, it is necessary to allege and prove that a binding contract was made to pay for the service at all events, whether the property be lost or not. The Versailles, [Case No. 16,924;] The William Lushington, 7 Notes of Cas. 361; The Centurion, [Case No. 2,554;] The H. B. Foster, [Id. 6,290;] The Independence, [Id. 7,014.]

Another objection to the right of the steamer R. B. Forbes to recover salvage compensation arises from the pleadings. It is insisted that the libellant does not make any such claim in the libel. That view of the libel is derived chiefly from the fact that it is alleged to be in a cause of contract civil and maritime, and of extra services rendered to the bark and her crew. Standing alone, that clause would furnish some support to this argument. Such, however, is not the fact, and the character of the claim set forth in the libel must be determined by the general scope of the several allegations of which it is composed. What is meant by contract and extra service is clearly and fully explained by the libellant, in the first and second articles of the libel, and also in the last. He alleges, in the first article, that the steamer was at Provincetown on the 23d of January, 1857, and that her master on that day reeived a letter from the owners of the bark, stating that she was adrift near the light-boat, off Hyannis, and requesting him to go with the steamer to her aid. In the second and succeeding articles, to the fourteenth inclusive, he states the nature and character of the service rendered, and it will be sufficient to say that the statements of the pleadings conform substantially to the proofs of the case, as they are exhibited in the record. After describing the service, the libellant alleges that, by reason of the perils incurred, and the great importance, nature, and value of the service, the owners of the steamer are entitled to, and reasonably ought to have, and do claim, an extra liberal compensation by way of reward therefor, commensurate with the service, its duration and risk. These allegations are sufficient in point of law, and constitute a proper legal foundation for the claim set up by the libellant at the hearing. That claim is warranted by the pleadings, and is fully sustained by the testimony. Every suggestion that the suit is collusive is sufficiently answered by the fact that the proposition does not find any support in the evidence. It was based chiefly upon the assumption, that some one or more of the underwriters upon the bark

owned some interest in the stock of the company to which the steamer belonged. Suppose it were so, it could not avail as a defence in this suit, as it would only show a partial and contingent interest in the property saved, which could not have the effect to disqualify the owners of the steamer, as a corporation, from performing a salvage service, and claiming therefor a salvage compensation. Whether it would or would not be otherwise in a case where the owners of the stock in the steamer and the insurers were the same, or substantially the same in interest, it is not necessary to decide, as there is no satisfactory proof to sustain that view of the present case. The Pickwick, 20 Eng. Law & Eq. 636. All the evidence shows that the bark was dismasted on the 18th of January, 1857, and that she remained in peril more or less imminent, until she was finally carried into the port of Hyannis by the steamer Westernport, and anchored near the wharf. It was a continuous peril; and as each of these vessels rendered valuable service to the bark, and contributed to her relief and safety, each is entitled to salvage compensation. According to the testimony, the Kensington was a schooner of one hundred and eighty-one tons' burden. She was worth about six thousand dollars, and her cargo on board, together with freight and outfits, were worth about twenty-five hundred dollars; making in all some eight thousand five hundred dollars. Her exposure was very considerable, and the service was entirely voluntary. She had nine men on board, and was employed in the service some twenty-four hours. Thirteen days were spent by the steamer R. B. Forbes, from the time she started on the enterprise up to the time she arrived with the bark at her place of destination. Some portion, however, of the time was virtually lost, while she was lying in the respective harbors of Provincetown and Hyannis, waiting for coal, or for the completion of the arrangements by which she gained possession of the bark. She is valued at eighty-five thousand dollars, and is usually employed in towing vessels on the coast, and it appears that the demand for towing at that time was very great. All the facts necessary to be considered in this connection, in the case of the Westernport, have already been stated, and need not be repeated. Considering the nature and duration of the service by the several parties, and the value of the property saved, together with the value of the property employed in the several undertakings, and the danger to which the whole was exposed, and the energy and perseverance displayed in saving the bark, her cargo and crew, it is believed that the property saved ought justly to pay a salvage compensation of thirteen thousand dollars, as the entire amount to all concerned. Of that sum five thousand two hundred dollars are decreed to the libellants in this case. Should any question arise as to its apportionment among the owners, officers, and crew, the parties will be heard when the case comes up for a final decree.

[NOTE. Originally there were three libels filed against the bark Island City and her cargo,—one by the owners, officers, and crew of the steamer R. B. Forbes; the second by the owners, officers, and crew of the schooner Kensington; and the third by the owners, officers, and crew of the steamer Westernport. Of the $13,000 allowed by the circuit court for all the services of the salvors, $5,200 was allotted to the R. B. Forbes, $3,300 to the Kensington, and $4,500 to the Westernport; but the court held that all that part of the compensation which would otherwise have belonged to the officers and crew of the Westernport was forfeited by their misconduct, and from that decree they appealed to the supreme court. In considering that appeal, Mr. Justice Grier remarked that, although no appeals had been taken in the other cases, the decisions might be collaterally challenged in the appeal of the Westernport, "in so far as they affect the rights of the libelant, if his vessel was entitled to the whole, and has received but one third," of the salvage. After reviewing the testimony, the supreme court concurred in the opinion of the circuit judge " that the bark was not abandoned after the salvage service commenced; that it was one continuous peril from which the bark was rescued, and that each of the several salvors contributed to the final result. The amount allowed for the salvage service was liberal, and the apportionment of it among the several salvors just and proper." The decree appealed from was affirmed. Cromwell v. The Island City, 1 Black, (66 U. S.) 121.]