## THE FLOTTBEK.

### (Circuit Court of Appeals, Ninth Circuit. October 6, 1902.)

### No. 826.

1. ADMIRALTY—APPEAL—QUESTIONS REVIEWABLE.

Objection to awards made for salvage services to the officers and crew of the salving vessel on the ground that they were not made parties to the libels cannot be raised for the first time in the appellate court.

2. SAME—SALVAGE SUIT—PARTIES.

According to the prevailing practice in admiralty, the owners of a vessel may maintain a suit for salvage services rendered on their own behalf and on behalf of the master, officers, and crew, and it is not essential that the names of the officers and crew should be stated in the libel, but they may be identified by evidence at any time before the award made is distributed.

3. SALVAGE—SERVICES ENTITLED TO COMPENSATION.

A steamship which went to the rescue of a distressed ship in response to her signals, and, after attempts to take her in tow proved unsuccessful, because of the breaking of the towline, proceeded to a port, and dispatched word to a tug company for relief, also at the request of the master of the imperiled ship, is entitled to a salvage award for her services, as are also her officers and crew, in so far as they contributed to the final rescue.

4. SAME.

The officers and crew of a tugboat, which started with another to the rescue of an imperiled ship, in response to her request for assistance,

¶ 4. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

but encountered sea perils which disabled her and compelled her return, so that she did not actually take part in the rescue, are entitled to a salvage award proportionate to their services and the risk to which they were exposed.

5. SAME—CONTRACT FOR TOWAGE SERVICES.

A contract by which a tugboat company agreed to perform all towage services that might be required by any of the vessels of a shipowner in the waters of the straits of Juan de Fuca, Puget Sound, British Columbia, or vicinity, at stipulated prices, did not cover salvage services rendered in the rescue of a ship of such owner from a place of danger outside the straits, and the towing of such ship to a safe port inside the sound.

6. SAME—NATURE OF SERVICE—PERIL OF RESCUED SHIP.

A sailing ship lay for two days and nights within a few hundred feet of rocks along the coast, during stormy weather and heavy seas, being held only by her anchors. On the second day the mate and half the crew abandoned her, and made a dangerous passage to the land in a lifeboat. On the following morning, when libelant's tugs came to her rescue, the wind had abated, but the sea was still high. The ship's distress signals were still up, and no objection was made to the assistance of the tugs, which was rendered at considerable peril in passing the lines, owing to the heavy seas. The ship also slipped her anchors, losing both anchors and chains, of the value of over $5,000, rather than take the few hours' time which would have been required to save them. *Held*, that a finding that the ship, when rescued, was in a position of great peril, was supported by the evidence.

7. SAME—EXCESSIVE AWARD—REVIEW BY APPELLATE COURT.

Awards made for salvage services in the rescue of a ship considered by the appellate court, and, under all the evidence, *held* excessive, and reduced.

Appeal from the District Court of the United States for the District of Washington.

In the court below there were two independent libels against the German ship Flottbek,—one by the Saginaw Steel Steamship Company, as the owner of the steamship Matteawan, and on behalf of her officers and crew; the other by the Puget Sound Tugboat Company, as owner of the tugs Wanderer, Tacoma, and Holyoke; and on behalf of their officers and crew, for salvage services. These two actions were, by stipulation of counsel and order of the court, consolidated for the purpose of taking testimony, trial, and entry of a final decree, but the interests of the libelants remain separate and distinct, and have been separately presented to this court in oral argument and by briefs. All of the testimony at the trial court was taken before commissioners. After the appeal was taken, this court gave permission to have further testimony taken as to the employment of certain named persons on the tugs owned by the tugboat company. The court, upon consideration of all the facts, awarded salvage to the owner of the steamship Matteawan, $6,000, and to her captain, officers, and crew $3,830; to the Puget Sound Tugboat Company, $8,000; to the captain, officers, and crew, $5,000,—making a total of $22,830, with interest at the rate of 6 per cent. per annum and costs. A general statement of the facts, applicable to both actions, was made in the court below, which is here adopted for the purpose of giving a general and correct history of the case: "By reason of the absence of the government lightship from her station at Umatilla Reef on the night of January 13, 1901, the German ship Flottbek, bound from Yokohama to Puget Sound, sailed into dangerous proximity to the rocks and reefs on the coast south of Cape Flattery. When land was sighted, all hands were immediately called, the yards were braced, and every possible effort made to change the course of the ship, but just at the critical moment the wind entirely subsided, so that the vessel became helpless, with the sea driving her inshore. Then both anchors were dropped in 25 fathoms of water. Almost immediately after coming to anchor, the wind came

strong from the west, and soon increased to a gale, which continued until' the evening of January 15th. It is impossible to determine from the evidence whether the vessel actually dragged her anchor at any time. Her captain admits that she might have drifted a little; but this is certain: if she did not drag, then the anchors were not dropped a moment too soon, for when she .was finally rescued on the morning of the 16th the distance between her stern and White Rock was less than 500 feet, and she was in a position between White Rock and a reef, on which the sea was breaking. During the entire interval from 1 o'clock a. m. of the 14th until 9 o'clock a. m. of' the 16th the sea was tempestuous, and the Flottbek was saved from destruction only by her anchors. The usual signals of distress were given and displayed, and soon after daylight on the 14th the steamship Matteawan, a large vessel, worth $350,000, owned by the Saginaw Steel Steamship Company, bound from San Francisco to Tacoma, responded to the call for help, conveyed by the signals, and upon request of the captain of the Flottbek attempted to take her in tow. In the raging storm several hours were spent maneuvering to take a towline from one ship to the other. During this time the Matteawan was at anchor, and her violent surging on her cable broke and destroyed her windlass, and disabled her to such an extent that she was obliged to sacrifice the anchor and chain, having no means to raise it. In view of their situation, the men on the Flottbek ought to have performed the labor and encountered the risks of carrying a line from their ship to the steamer. They did so in the first instance, but the line broke, and then one of the Matteawan's boats was launched and manned by her second officer and three others of her crew, who buffeted with the waves until a second line was passed, which was used to draw the towline from the ship to the steamer. The boat was liable to be capsized by the high rolling waves. * * * The Flottbek's towline was finally secured on the steamer, but, before any strain had been put on it other than the violent dashing of the waves, it parted. The captain of the Matteawan, then seeing that he could not rescue the Flottbek nor remain where she was without endangering his own vessel, signified that it was necessary for him to go on his way, and was thereupon requested by the captain of the Flottbek to report his position and send relief, and the Matteawan did hasten as a dispatch boat to call relief, consuming in that service an extra amount of coal. She arrived at Neah Bay after dark, and spent some time there, giving an alarm by signals which resulted in a message being telegraphed to the Puget Sound Tugboat Company at Seattle. Accurate information as to the location of the Flottbek was also communicated to the Puget Sound Tugboat Company by giving the information to the company's steamer Magic, which met the Matteawan in the straits of Juan de Fuca, and finally, on arrival at Tacoma, the captain of the Matteawan sent full information to the tugboat company and to the Merchants' Exchange at Seattle and San Francisco. * * * In less than one hour after receiving the message from Neah Bay on the night of the 14th, the steamtug Richard Holyoke was dispatched from Seattle. On her way to the cape she met the Wanderer, owned by the same company, and the two proceeded together towards the cape, and actually encountered heavy seas at the entrance to the straits; but the machinery of the Holyoke became disabled, and both returned to Neah Bay. The steamtug Tacoma, towing a ship down the straits, also received orders to go to the rescue of the Flottbek, and at once took the ship into Callam Bay, and left her at anchor, and then proceeded to Neah Bay, where she met the Wanderer, and the two waited there during the night of the 15th, and when daylight came on the morning of the 16th they proceeded together, and arrived in the vicinity of the Flottbek between 8:30 and 9 o'clock a. m. At that time there was very little wind, but the waves were rolling high, washing over the decks of the tugboat, making it extremely difficult for men to stand up on the deck, or to do the work necessary in taking a ship in tow, and the Flottbek was rolling and surging heavily on her cables. In spite of all difficulties, a towline was promptly and skillfully passed from each of the tugs, and the Flottbek slipped her cables, sacrificing two anchors and about 195 fathoms of chain, and was towed by the two tugs to a place of safety within the straits, when the

Tacoma was detached, and the towage was finished by the Wanderer to Tacoma. On the 15th, while the storm was still raging, and with no help in sight, the men on the Flottbek considered that the extreme danger of their situation justified them in·taking to the boats and abandoning the ship. Accordingly the first mate and half the crew left the ship in a boat, and effected a landing on the beach, and then gave a signal agreed upon, signifying that they had succeeded in getting ashore without any of the men being drowned. By that time the storm had commenced to abate, and the captain determined that he would not leave the vessel, and upon making that announcement those who were still in the ship decided to remain with him. During the night the wind fell to a light breeze, and hauled around to the east, and on the morning of the 16th, before the Tacoma and the Wanderer came in sight, the captain and men on the Flottbek indulged hopes of being able to get their ship away with the help of the offshore breeze, but they had not taken any steps to do so, and the distress signals were still displayed when the tugboats arrived." The Flottbek (D. C.) 112 Fed. 682. Other facts will be mentioned in the opinion whenever necessary to meet the contentions of the respective parties.

There are in the record 21 assignments of error. These are reduced to 11 in the brief of appellant. The points to be discussed under these assignments may be classified under the following heads: (1) Did the court err in holding that the Matteawan, owned by the Saginaw Steel Steamship Company, its master, officers, and crew, were entitled to any salvage reward? (2) Did the court err in awarding salvage compensation to the Puget Sound Tugboat Company for the services performed by the tugboat Richard Holyoke? (3) Did the court err in holding that the services of the tugboats Wanderer and Tacoma were not governed by the contract of the owners of the Flottbek with the Puget Sound Tugboat Company? (4) Did the court err in holding that the Flottbek, when taken in tow by the Wanderer and Tacoma, was in a position of great danger or peril? (5) Were the awards allowed by the court in favor of each of the libelants herein, its officers and crews, excessive?

Williams, Wood & Linthicum, J. C. Flanders, J. M. Ashton, and W. L. Sachse, for appellant.

Struve, Allen, Hughes & McMicken, for appellee Puget Sound Tugboat Co.

Metcalfe & Jurey, for appellee Saginaw Steel Steamship Company and master and crew of the Matteawan.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The essential ingredients to be considered by the courts in determining the amount of the award that should be decreed in cases of this general character for salvage services is clearly expressed by Justice Clifford in The Blackwall, 10 Wall. 1, 14, 19 L. Ed. 870, as follows: (1) The labor expended by the salvors in rendering the salvage service. (2) The promptitude, skill, and energy displayed in rendering the service and saving the property. (3) The value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed. (4) The risk incurred by the salvors in securing the property from the impending peril. (5) The value of the property saved. (6) The degree of danger from which the property was rescued. The Mary E. Dana (D. C.) 17 Fed. 353, 357; The Queen of the Pacific (D. C.) 21 Fed. 459, 472.

The Matteawan was of the value of $300,000. The tugs were of the value of $40,000 each. The Flottbek was of the value of $60,000. There are certain preliminary objections raised by appellant to the right of certain of the parties, to whom awards were made, to maintain the suit, or to recover any salvage whatever, which will be first disposed of.

1. Appellant contends that the officers and crews of the Matteawan and of the tugboats are not entitled to any award whatever because they were not made parties to the libels brought by the owners of the Matteawan in the one case and the owners of the tugboats in the other; that they never intervened therein, or in any manner ratified the acts of the respective libelants, and that their claims to salvage are not supported by any proper allegations in the libels or by proofs. None of these objections were made in the court below, as they should have been if there was any merit in them, because, if timely suggestions had been made, they could easily have been remedied; and we are of opinion that, not having been made in the court below, they ought not to be considered for the first time in this court. The Commander in Chief, 1 Wall. 44, 52, 17 L. Ed. 609. But the objections are without any merit whatever. The record shows that both libels were brought by the owners "and on behalf of the master, officers, and crew," and in this respect the libelants followed a practice which prevails in admiralty. There is no pretense that any of the men to whom awards were given were not officers or members of the crew of the ship or the tugboats. It would doubtless have been better to have mentioned all the names of the officers and crew. It would at least have obviated the objections here made. But the object of naming them is simply to bring them before the court, so that it will know the names of the officers and crew entitled to an award. This was done in the present case by the evidence. The tugboat company, after the case was tried in the court below, evidently anticipating that objections might be made to the manner of proof on this point, took additional evidence by leave of this court, and Capt. J. B. Lilly, the manager of the tugboat company, who employed all the men on the tugs, gave the names of all the officers and crews employed on the respective tugs. But even if the names did not appear, the court would have had the power to award a specific sum for their services, and retain the money in court, until proper steps were taken to ascertain their names. In The Blackwall, supra, the court said:

"Salvage suits are frequently promoted by the master alone, in behalf of himself and the owners and crew, or in behalf of the owners and crew, or the owners alone, without making any claim in his own behalf, and the practice has never led to any practical difficulty, as the whole subject, in case of controversy, is within the control of the court. * * * Cases may also be found where co-salvors, who neglected to appear and become parties to the suit until the decree was pronounced, were allowed to petition the court for such compensation out of the fund in the registry of the court, and where their claim received a favorable adjudication."

See, also, The Adrirondack (D. C.) 2 Fed. 872; The Leipsic (D. C.) 5 Fed. 109, 112; Ben. Adm. (3d Ed.) § 384.

2. It is claimed by appellant that the award to the Matteawan

should have been based only upon the value of the services actually rendered by her in reporting the position of the Flottbek to the Puget Sound Tugboat Company, and that the court erred in considering the services rendered by it, its officers and crew, in their unsuccessful attempt to tow the Flottbek. The court, in the course of its opinion, said:

"The owner of the Matteawan is entitled to be compensated for the injury resulting to that vessel from efforts in behalf of the imperiled ship in response to the direct request of her captain."

We do not understand appellant to deny this proposition. It was stipulated by the respective parties that "$2,512.46 is the actual damage to the said steamship Matteawan happening by reason of the efforts of the said steamer to salve the said ship Flottbek," on the 14th day of January, 1901. This would leave about $3,500 that was awarded to the Matteawan for salvage services. It has frequently been said that success is an essential element of salvage service, and its absence fatal to a claim for salvage compensation. As a general rule, this is true. But there are certain exceptions to this rule. Much depends upon the peculiar facts of every particular case. In determining the point at issue, we shall endeavor to confine ourselves to the undisputed facts of the present case. There is no pretense that the Matteawan at any time ever abandoned its efforts to relieve the Flottbek, and it must be kept in mind that her services in going to the Flottbek and in leaving that ship to signal for aid were performed at the special request of the Flottbek, and, in so far as these services resulted, in connection with the efforts of the tugs owned by the Puget Sound Tugboat Company, in rescuing the Flottbek from its peril the Matteawan, its officers and crew, independent of and in addition to the compensation of the ship for repairs, are entitled to salvage services. Among the recognized elements of salvage services is the "taking aid to a distressed ship, or information for her to port," and "standing by a distressed ship." Hughes, Adm. 127, 128; The Undaunted, Lush. 90; Allen v. Canada, Bee, 90, Fed. Cas. No. 219; The New Orleans (C. C.) 23 Fed. 909. Salvors are more than common laborers, and their reward is of a character essentially different from wages. Salvage is decreed by courts of admiralty as a reward for services successfully rendered in saving property from maritime damage, not on the principle of a quantum meruit, or as compensatory remuneration, but as a reward for perilous services, and as an inducement to seamen and others to readily engage in such undertakings and assist in saving life and property. Danger, peril, and a successful deliverance therefrom either by voluntary effort, special request of, or by contract with the owner, constitutes a case of salvage, whether rendered by one or more salvors. Each salvor that renders a meritorious service directly aiding in the rescue and saving of the property is entitled to a salvage award. The Island City, 1 Cliff. 210, Fed. Cas. No. 55; Id., 1 Black, U. S. 121, 17 L. Ed. 70; The Fanny Brown (D. C.) 30 Fed. 215, 220, and authorities there cited; The Jewel (D. C.) 41 Fed. 103; The Strathnevis (D. C.) 76 Fed. 855, 862, and authorities there cited;

The Sabine, 101 U. S. 384, 387, 25 L. Ed. 982. In this connection it is claimed that the officers and crew of the tugboat Holyoke are not entitled to any salvage award. The Holyoke never reached the Flottbek. The services performed by its officers and crew were very slight, but, in view of the conclusions just reached as to the Matteawan, and the authorities cited, we are not prepared to say that the services rendered by them did not entitle them to any salvage award.

3. The court did not err in holding that the Puget Sound Tugboat Company was not estopped from claiming any salvage award · by reason of its contract with the owners of the Flottbek to tow its ships. This contract reads as follows:

"The party of the first part agrees to tow with reasonable and quick dispatch all the vessels owned and controlled by parties of the second part that may be in the waters of Straits of Juan de Fuca, Puget Sound, British Columbia, or vicinity, whether inside or outside of Cape Flattery, and that may require any towage service during the continuance of this agreement, at the rates specified below."

There is a marked and clear distinction between a towage and a salvage service. When a tug is called or taken by a sound vessel as a mere means of saving time, or from considerations of convenience, the service is classed as towage; but if the vessel is disabled, and in need of assistance, it, is a salvage service. In cases of simple towage, only a reasonable compensation is allowed, as upon a quantum meruit. In case of salvage, the award is upon a broader and more liberal scale, as we have before stated. In McConnochie v. Kerr (D. C.) 9 Fed. 50, 53, Judge Brown said:

"A salvage service is a service which is voluntarily rendered to a vessel needing assistance, and is designed to relieve her from some distress or danger either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage, without reference to any circumstances of danger."

The authorities upon this subject are quite numerous. Many of them are cited in The J. C. Pfluger (D. C.) 109 Fed. 93, 95, and in Hughes, Adm. § 57. See, also, the Veendam (D. C.) 46 Fed. 489, 491.

Applying this distinction to the case at bar, it is manifest that the contract between the parties does not, and was not intended to, include the character of salvage service rendered by the tugs of the tugboat company to the Flottbek under the circumstances and conditions established by the evidence in the present case. In construing contracts we must search for the intention of the parties at the time the contract was made. The contract in question, by its plain language and clear import, was evidently understood and intended by both parties to cover only towage services pure and simple, no other. In addition to the portion of the contract above quoted, there is a provision therein whereby the shipowners "agree to employ exclusively the tugs under the management of said party of the first part as long as said party performs the services with reasonable dispatch." And it is further provided "that if, at any time during the terms of this agreement, the party of the first part shall sign a contract with shipowners establishing rates of towage less than

herein specified, then this contract shall be so modified that the said parties of the second part hereto shall be required to pay thereafter for towage service only at the lesser rate agreed to in such last-named contract." Then follows the rate of towage services from and to the points therein specified. And these rates, as well as other portions of the contract, clearly indicate that they were not intended to cover services of the character rendered by the tugs of the tugboat company in releasing the Flottbek from the risks and dangers she was in and towing her to a port of safety.

4. It is contended by appellant that the court erred in finding that the Flottbek, when taken in tow by the tugs Wanderer and Tacoma, was in a position of great peril and danger. This point is argued with much earnestness on the part of appellant. The question is one of great importance. The greater the peril, the greater the award; less danger, less compensation. We do not understand appellant to deny that the Flottbek was, on the evening of the 13th and on the 14th and 15th days of January, 1901, in a perilous position, in great need of help and assistance. This is clearly shown by all the testimony beyond any controversy or conflict. The disputed conditions relate to the night of the 15th and morning of the 16th of January. The records at Neah Bay kept by the observer of the weather bureau show the velocity of the wind and conditions of the barometer at that point. At 5 a. m. on the 14th the barometer rating was 29.645; the direction of the wind was southwest, 10 miles per hour. In the afternoon of that day the barometer rating was 29.955; direction and velocity of the wind was west, 12 miles; maximum velocity, 32 miles from the west. The morning of the 15th, barometer 30.163; direction of wind, southwest; velocity, 9 miles; maximum velocity during the preceding 12 hours, 30 miles from the southwest. P. M. of the 15th, barometer 30.198; direction of the wind west, 15 miles; maximum velocity, 28 miles from the west. A. M. of the 16th, barometer 30.482; velocity and direction was calm; maximum velocity and direction 17 miles from the west. P. M. of the 16th, barometer 30.503; velocity and direction was calm; maximum velocity, 6 miles from the east. The observer stated that Cape Flattery had a higher velocity of wind than Neah Bay; that Neah Bay is much more sheltered. The contention of appellant is that these conditions would have enabled the Flottbek—that had remained for over 48 hours in the roughest portion of the weather without any special injury to herself—to have sailed away without assistance, and it was the intention so to do when the tugs arrived on the morning of the 16th. Capt. Schoemaker, master of the Flottbek, testified that during the night of the 15th "the ship was all right; there was no danger at all"; that on the morning of the 16th he told the men there was a little breeze, and that he thought there would be breeze enough to sail off; that there was an offshore breeze from the east; the men said, "'If we had a little more breeze, we could do it, we could slip our chains;' and at daylight we made everything ready so we could slip the chains at short notice, and then I said we should take breakfast, and we would put sail on and sail her off;" that after breakfast, about 8 o'clock, the tugs came in sight; that the crew

118 F.—61

of one of them took some photos of the ship; "they gave us their ropes; we let go our cables, and they towed us through the straits of San Juan de Fuca;" "when they got the hawsers tight, we immediately let go chains, and went out to sea." About 20 minutes after the tugs came alongside of the Flottbek, everything was ready. After testifying that there was "a little water on deck when the Matteawan was there," the following questions and answers were given:

"How was it the afternoon of the 15th, or night of the 15th and the morning of the 16th? A. Then I don't think there was any water on board. Q. She was rolling? A. Yes, sir. Q. Was she pulling at her anchors? A. No, the anchors were slack. Q. The anchors were slack when? A. All the night * * * from the 15th to the 16th. Q. How were they the morning of the 16th, when the tugs came alongside? A. They were hanging right up and down. Q. At the time the tug was made fast, was there any danger to your ship or your crew from the rolling of the vessel? A. Well, no, not actual danger then, I think. Every movement of the ship can make an accident. Q. Were any of your crew hurt, as a matter of fact, while your ship was lying at anchor in that position? A. No, sir. Q. You may state, captain, whether or not your vessel sustained any injury in any part by the pulling while she lay there at anchor. A. No, sir; there was no injury to the vessel, except a little to the windlass. Q. When did the windlass receive that injury? A. Little by little; on this morning some, and the next morning also some, when the gale was blowing. Q. When you slipped your cable, did anything break aboard your ship? A. Yes, sir; the chain stoppers broke. Q. You lost both anchors? A. Yes, sir. Q. How much chain did you lose? A. About 195 fathoms of chain. Q. Did you undergo any other repairs here in Tacoma other than the cables and the chains and anchors? A. Well, hardly any repairs; a little bit to the windlass, that is all. Q. You lost your towrope, you say? A. Yes, sir. Q. Did you lose any other rope? A. Yes, sir; a great many other ropes. I think about a dozen coils. Q. Any blocks? A. Yes, sir; a great many blocks, as well. Q. How much, captain, was the cost of replacing to the ship these items which you have mentioned? A. About $7,000, that I lost."

The testimony of several members of the crew of the Flottbek corroborated the foregoing testimony of the master. Mr. Williams, the mate of the tug Tacoma, among other things, testified as follows:

"Q. Well, was there any difficulty in paying out your hawser? A. Well, it was dangerous on account of the water coming over us all the time. We would be down on our hands and knees and taking hold on the rope. It was pretty dangerous for the men to be around the deck. Q. Who attended to paying out the line? A. Myself and the other two men, and there was one man at the wheel. * * * Q. On account of the seas, was your tug-boat able to hold its position, or did it back the fill? A. He held the position there. He would have to work the wheel all the time backwards and forwards to turn her around,—to get her around so as to head the seas, and to try to keep her heading on to the sea. Q. What was your duty in paying out the hawser? A. To see that it would not get foul of the wheel, and to see that everything was all clear. * * * Q. You say the seas were washing over you while you were there? A. The seas were washing over us all the time. Q. How did you manage to hold fast? A. We would get right down on our face and hands on the grating. * * * Q. Did you get your hawser made fast, and get it all out before the Wanderer did? A. No, sir; not all of it. The captain gave me orders to shackle the other hawser on it because the sea was so heavy we daren't pull on the one rope. I didn't pay much attention to the Wanderer, because I had enough to do to look after our own rope."

Substantially the same testimony was given by Nelson, the mate of the Wanderer.

In connection with all of this testimony it must be remembered that the Flottbek, on the morning of the 16th, only had one-half of its regular crew present. The master upon this point gave the following testimony:

"Q. Now, you say that the first officer, with eleven men, left the ship? A. Yes, sir. Q. And they would rather risk their lives, you state, to get ashore, than to stay with the ship and run their chances? A. Yes, sir. Q. Of being lost with her? A. It was a poor thing to be in sight of a lighthouse and no steamers coming there. Q. They would risk their lives to take the boat and go ashore? A. Yes, sir. Q. And they did that because they were so much afraid on the ship; that is it, wasn't it? A. Well, in a gale of wind there was danger. Q. I say that is why they left,—they were afraid of their lives on the ship? A. Yes, sir. Q. And the first officer left you with eleven men? A. Yes, sir. Q. You had no officer left with you,—just yourself and twelve men? A. That is right."

The master, after his safe arrival at Tacoma, entered in his logbook the following:

"January 15th. Heavy gale from southwest, with very much strain on the chains. The tackles didn't always hold, and had to be replaced. No assistance in sight. The crew wished hard to leave the ship with the first moderate weather, because behind the reef astern of the ship was to be seen from aloft a place where possibly a boat could land. It was thought better to try at least to land than to stay on board, where there was certain destruction if no assistance arrived."

There is considerable conflict in the testimony as to how close the Flottbek was to the rock; some of the witnesses placing it from one-fourth to one-half mile. The court found that when the tugs arrived upon the scene the stern of the Flottbek was towards White Rock, and distant not more than 500 feet. This finding is supported by the testimony of the officers and crew of the tugs and by the photos taken from one of the tugs, and, without entering into all the details upon this point, we are of opinion that the finding of the court is fully sustained by the preponderance of the evidence. The position of the Flottbek was constantly changing more or less. In this connection the peril of the ship and its situation on the afternoon of the 15th of January is shown by the testimony of the mate of the Flottbek when he, with 11 members of the crew, without objection of the master, abandoned the ship, and by means of a lifeboat left for the shore:

"Q. And when you left her, you left her because you thought you would be safer in risking your life to get on shore than to stay on the ship? A. Yes, sir. Q. Now, this was a very dangerous trip that you took in your small boat, too, wasn't it? A. Yes, sir; it was. Q. The lives of yourself and the men were in constant danger from the time you left the Flottbek until you reached the shore? A. Yes, sir. Q. As you passed along these reefs you could almost put your hands out and touch the rocks? A. Sometimes we touched the rocks with the oars. Q. And the sea was rolling heavily at the time? A. Yes, sir. Q. If that boat had struck any one of these rocks, you would have all gone down? A. Yes, sir. Q. You and these men that left with you preferred to risk your lives in going to the shore than to stay on the ship? A. Yes, sir; that is what we did. Q. You felt that staying on the ship was putting your lives in peril every moment? A. Yes, sir."

While the master of the Flottbek testified that "there was no danger at all" on the night of the 15th of January, he admits that he or

some of the crew were on deck during the entire night, constantly displaying signals for assistance. "Q. You say you kept putting up signals of distress? A. Yes. Q. You meant something by that, didn't you? A. Yes, we wanted a tug steamer."

In the light of all the testimony it seems to us apparent that the master, his officers and crew, considered the Flottbek in peril on the morning of the 16th of January. This is shown by at least three of the undisputed facts: (1) When the tugs arrived upon the scene, her distress flags were still flying,—"fluttering in the breeze,"—and remained until the ship was rescued by the tugs. (2) No objections were made to the services of the tugs. The master willingly accepted their aid. He did not tell the tugs that he was in no peril, and could safely sail his ship. (3) The master and crew were not anxious to remain, and take their chances of getting away from the breakers and the rock, because, notwithstanding the "calm weather" testified to by the master, just as soon as the tugs made fast their hawser, he slipped his cables, and abandoned both his anchors and chains, of the value of over $5,000, in order, as he stated, to save time. It would not have taken more than a few hours, or half a day at furthest, to save this property; but no such suggestion was made. Is it not apparent that he left because he considered there was danger to remain? Do not his actions at the time speak more strongly than his words, uttered long after all danger was over?

5. This brings us to the main question, were the awards in the present case excessive? In the light of the principles already decided, but little more need be said on this question. It is one that appeals to the conscience, the common sense, sound judgment, and legal discretion of the court. It is no easy task to arbitrate this vexed question. The nisi prius courts are sometimes in favor of high awards,—too high, in fact; while others lean strongly in favor of low awards,—too low, in fact. The question being one that rests largely within the discretion of the trial judge, the appellate courts are loth to interfere. Hence it is that the books are full of cases where decrees have been sustained in the one case deemed too small and in the other where it seemed too large.

In The Baker (C. C.) 25 Fed. 771, 773, the court said:

"The allowance of salvage is necessarily largely a matter of discretion, which cannot be determined with precision by the application of exact rules. Different minds, in the exercise of independent judgment upon the same evidence, seldom coincide exactly in their views of the facts, or give the same prominence to the varied elements which make up the case. An approximate concurrence is all that can be expected. For this reason appellate courts are not disposed to interfere with decrees in salvage cases merely because the sum allowed the salvors is larger than the appellate court would have allowed."

In Simpson v. Dollar, 48 C. C. A. 663, 109 Fed. 814, 816, this court said:

"No exact criterion can be found for estimating the amount of salvage in any case. The judgments of courts must necessarily differ as to the precise amount to be allowed under given circumstances. Where there has been no mistake in fact, or application of an unwarranted rule of compensation in arriving at the award, and the amount allowed cannot be clearly

seen to be inappropriate, the courts on appeal have been reluctant to disturb the decision of the trial court. The Bay of Naples, 1 C. C. A. 81, 48 Fed. 737; The Amity, 16 C. C. A. 170, 69 Fed. 110; The George W. Clyde, 30 C. C. A. 292, 86 Fed. 665; The Trefusis, 39 C. C. A. 96, 98 Fed. 314; The Emulous, 1 Sumn. 214, Fed. Cas. No. 4,480."

But the appellate courts are the final arbiters, and it is their duty to decide the question fearlessly and impartially, with an eye single to reach the ends of justice. The Sirius, 6 C. C. A. 614, 57 Fed. 851; The Elmbank, 16 C. C. A. 164, 69 Fed. 104, 109; The Haxby, 28 C. C. A. 33, 83 Fed. 715; The Brandywine, 31 C. C. A. 187, 87 Fed. 652; Ulster S. S. Co. v. Cape Fear Towing & Transportation Co., 36 C. C. A. 201, 94 Fed. 214, 219; The New Camelia, 44 C. C. A. 642, 105 Fed. 637. That the awards in the present case are high must be conceded. Recognizing the meritorious services performed by the salvors, the peril they were in, at least during a portion of the time in the performance of their services, and the conditions, peril, and circumstances that surrounded the Flottbek, were the awards excessive? Taking into consideration all the rules upon this subject, and guided by all the lights furnished by the evidence, our conclusion is that the awards were excessive, and should be reduced. This conclusion does not, however, call for the reversal of the decree. The decree will be modified by reducing the award to the Matteawan, its officers and crew, one-third; to the Puget Sound Tugboat Company and the officers and crews of the tugboats Tacoma and Wanderer, one-third; and the officers and crew of the Holyoke one-half. Each party to pay its own costs upon appeal.