## THE QUEEN OF THE PACIFIC.

*(District Court, D. Oregon.* September 9, 1884.)

1. **SALVORS, WHO ARE, AND COMPENSATION OF.**
   A person rendering aid to a ship in distress is a salvor, whether he is a mere volunteer or acts upon the request of the owner or agent of the ship; and unless there is an express contract to the contrary, or such a one must necessarily be implied from the circumstances of the case, the law implies that the service is to be compensated for on the usual condition of the ultimate safety of the property.

2. SAME—AMOUNT OF COMPENSATION.

A salvor in pursuance of a request is entitled to compensation according to the circumstances of the case, although he is unsuccessful, if the property is not lost or is otherwise saved; but a mere volunteer is not entitled to any compensation unless he succeeds, and the fact that his reward depends on this contingency may enhance the amount of it; but even when a salvor acts in pursuance of a request, and it is manifest that the property in peril must be wholly saved or lost, his compensation also depends upon the contingency of success, and should be enhanced accordingly.

3. SAME—REWARD.

In awarding compensation for a salvage service the courts do not stop at mere payment for the work and labor performed, but go further, and give the salvor an appropriate reward in the interest of commerce and navigation.

4. SAME—ELEMENTS OF COMPENSATION FOR SALVAGE.

The elements that enter into the estimate in fixing the compensation for a salvage service are : (1) The value of the property saved and of that employed in saving it ; (2) the degree of peril from which the saved property is delivered ; (3) the risk to which the property and person of the salvor is exposed ; (4) the severity and duration of his labor ; (5) the promptness with which he interposed his services ; and (6) the skill, courage, and judgment involved in them.

5. SAME—PAYMENT FOR SERVICE, WHEN NOT A BAR TO SUIT FOR SALVAGE.

A payment received by a salvor as for work and labor and use of material, upon the reasonable understanding on his part that the other and principal salvors would settle and receive payment on the same basis without a suit for salvage, is no bar to such salvor intervening for his interest in a suit subsequently brought by such other salvors for salvage, and receiving his due share of the award therefor, less the payment theretofore made.

In Admiralty.

*M. W. Fechheimer* and *Henry Ach,* for libelants

*Milton Andros* and *Cyrus Dolph,* for claimant.

*C. E. S. Wood,* for intervenors Gray *et al.*

*John H. Woodward,* for intervenors Kidd & McDonald.

DEADY, J. This suit is brought against the steam-ship Queen of the Pacific, "her tackle, apparel, furniture, appurtenances, and cargo," to obtain compensation for a salvage service rendered them by the libelants. It is brought by George Flavel, the managing owner of the steam-tugs C. J. Brenham, Astoria, and Columbia; and W. S. Sibson, the managing owner of the steam-tug Pioneer; and 21 others, comprising the crews of said tugs, and for all others entitled. The libel was filed October 13, 1883, and on the same day the vessel was arrested and delivered to the owner, the Pacific Coast Steam-ship Company, on a claim made by Mr. C. H. Prescott, its managing agent at this port. The answer of the claimant was filed on December 1st, and admits that the libelants performed a salvage service in respect to the vessel and cargo; and the contest between the parties is practically confined to the value of such service, and particularly to certain matters of fact, upon which the determination of this question largely depends.

On May 28, 1884, the Ilwaco Steam Navigation Company, J. H. D. Gray, and 19 others, the crews of the steam-tugs Gen. Canby and Gen. Miles and a scow, filed a libel of intervention on behalf of themselves, as the owners, agents, and crews of said tugs and scow, set-

ting forth the part they performed in the saving of the vessel, and asking that a corresponding portion of any sum allowed as a compensation therefor may be awarded to them by the court.

The answer of the claimant to the libel of intervention admits that the intervenors rendered the services alleged by them, but denies their alleged value and importance, and the circumstances of danger and risk relied on to give them enhanced value, and also sets up that they were paid for by the claimant at the time as follows: To said Gray, as agent for the said Ilwaco Steam Navigation Company, $600; and to said Gray, personally, for the use and services of said scow and crew, and his own services, $654.

An amendment to the libel of intervention admits the payment alleged in the answer, but denies that it was received in full satisfaction of the service rendered, but with the express understanding that it should not operate as a bar to the claim of the intervenors as salvors in any suit that might be instituted for salvage.

Between November 21, 1883, and April 24, 1884, three libels of intervention were filed by a number of persons who appear to have been employed and paid by the claimant to throw over cargo, or were of the volunteer crew of the boat from the life-saving station. From the answers of the claimant thereto it appears that this crew have a suit now pending against the Queen, in Washington Territory, for the same service, and that the stevedores were employed and paid by the claimant at the rate of half a dollar an hour for their labor, and the proof sustains the answers in both cases. No evidence was offered or argument made on behalf of these intervenors, and it is taken for granted that their claims are abandoned and their libels will be dismissed. Separate libels of intervention were also filed by John McDonald and John S. Kidd, alleging that they assisted in saving the Queen,—McDonald by serving as "sole fireman" for "ten hours or more" on the tug Pioneer during the time she was employed in rescuing the Queen, and Kidd as "sole engineer" on such tug during all such time. No defense is made to these claims, and they will be taken as confessed. Besides, that of Kidd is proven by his own testimony.

Briefly, the facts, either admitted or proven, concerning the stranding of the vessel and her rescue, are as follows:

On September 2, 1883, the steam-ship Queen of the Pacific, being engaged in the coasting trade between Portland and San Francisco, left the latter port for the former, and arrived off the mouth of the Columbia river in the forenoon of September 4th, where she anchored for a time within the sound of the automatic buoy, and then crossed the bar and entered the river by the south channel, under the direction of a licensed Columbia bar pilot, whom she carried for that purpose. The weather was very thick with fog and smoke, the wind was light, and the sea quite calm. As she came abreast of Clatsop spit the vessel lost the channel and turned to the southward; and at or near high water, and about 1:45 P. M., ran hard and fast on the

north end of said spit, in the quicksand, at a point about one-fifth of a mile to the south-westerly of a straight line drawn between Cape Disappointment and Point Adams lights, and about one mile and a third to the north-easterly of red buoy No. 2, and one mile and a half south of the wreck of the Great Republic, and within the 12-foot line, where she lay, heading south-easterly, at nearly a right angle with the channel, until she was pulled off the next day.

On this voyage the Queen had on board Mr. George C. Perkins, the vice-president of and a director in the Pacific Coast Steam-ship Company, and one of its general managing agents, and was fully equipped and manned. She was then about one year old, and worth $485,-000, and carried 160 cabin and 74 steerage passengers, and 1,860 measured tons of freight, worth $315,000, of which $95,000 worth was jettisoned, together with the United States mails and express matter of not less than $22,750 in value. The passage money, which was prepaid in San Francisco, amounted to $3,124.56. The freight on the whole cargo was $8,955.07, and on the portion saved it was $5,912.28.

As soon as the vessel stranded the master ordered the engines reversed, and attempted to back her off, but without success. Guns were at once fired and steam-whistles blown as signals of distress, and the chief officer, Mr. Hall, dispatched in a small boat to Astoria, with a message to Capt. George Flavel, one of the libelants, to send all the tugs under his control to the assistance of the Queen. The signal guns were heard by the lookout of the tug J. C. Brenham, then lying at anchor in Baker's bay, and the fact at once communicated to her master, M. D. Staples, who immediately started with his tug in the direction of the spit, taking with him, at the request of Capt. O. T. Harris, then in charge of the life-saving station at Cape Disappointment, a life-boat and volunteer crew. The weather was very thick, and the Brenham proceeded under a slow bell, at the rate of about six miles an hour, across the middle sand, directly for the spit, through a channel known to the master, and called the "Cut-off," and reached the vicinity of the Queen in about 25 minutes. The Brenham then drew about 11 feet of water, and approached within about 150 feet of the stern of the ship, and a little on the port quarter, and was hailed by some one thereon, and asked to "come closer." But, the tug striking the bottom, she withdrew from the ship near one-fourth of a mile, but within ear-shot, where she lay to until near 5 o'clock in the evening, when, having received about 125 of the Queen's passengers from her starboard gangway by means of the life and ship's boat, she proceeded to Astoria, where she arrived with the passengers at half past 6 o'clock, and delivered a message from the Queen, concerning their disposition, to the claimant's agent at that place.

In the meanwhile, the steam-tug Canby, the property of the Ilwaco Steam Navigation Company, then drawing from seven and a half to eight feet of water, in the course of its regular trip from Astoria to

Cape Disappointment, met Hall, of the Queen, on his way to Astoria in the small boat, when the master of the tug,—Thomas Parker,— learning what had befallen the Queen, returned with Hall to Astoria, where the latter delivered the message from the Queen for help to Flavel. The intervenor and agent of the Canby, J. H. D. Gray, having learned from Staples and Hall, on their arrival in Astoria, of the condition of the Queen, immediately and of his own motion equipped and manned a scow belonging to himself, then lying at Astoria, loaded with sand, and, taking it in tow of the Canby, carried it to the Queen, unloading the sand in the river as he went, and giving pilots Gunderson and Doig a passage there on the tug; and this he did with the purpose, then publicly avowed, of enabling the Queen to get a heavy anchor out astern in time to prevent the next tide from swinging her around or driving her further up on the sand, and to aid in lightening her of her cargo. Gray arrived at the spit between 4 and 5 o'clock, and anchored about 100 yards off the ship's port quarter, where, by means of a line to the Queen and one to the tug, the scow was used as a ferry between the two, whereon 100 or more passengers, with their hand baggage, were transferred from the Queen to the Canby, and Gray was about starting with them to Astoria, when, at the request of the master of the former, he transferred said passengers to the tug Pioneer, then lately arrived from Astoria, and remained with the Canby by the Queen to assist in putting out her anchor. That evening, at slack low water and about 9 o'clock, the ship's bow anchor, weighing about 5,500 pounds, was lowered onto the scow and towed astern about 100 fathoms by Gray, and dropped a little off the port quarter. A fourfold purchase was then applied to the inboard end of the 12-inch hawser attached to this anchor, and the fall carried to the steam-capstan, and hove taut for the purpose of preventing her from going further on the spit and also of helping her off on the next high tide.

On the morning of the 5th, Gray, after placing the scow along-side of the Queen, sent the Canby away on her regular business, but remained himself with the scow, and took from the ship baggage of the value of $15,000, and express matter of much greater value, which, with the aid of the Gen. Miles, a steam-tug belonging to said Ilwaco Steam Navigation Company, he safely towed to Astoria on the afternoon of said day.

As soon as Flavel received the message from the Queen, on the 4th, he dispatched from Astoria the tug Pioneer, D. J. McVicar, master, to the assistance of the ship, which, with Hall and his small boat and crew on board, reached there about 5 o'clock P. M. of the same day, and anchored about one-fourth of a mile distant from the Queen, where she received the passengers from the Canby, as above stated, and then carried them to Astoria, where she arrived about 8 o'clock in the evening, and remained until the next morning. While dispatching the Pioneer, Flavel had the tug Astoria, then laid up at

her dock, made ready and a special crew employed, and sent to the aid of the Queen, where she lay until the next morning.

About 9 o'clock in the evening of the 4th a consultation was held on board the Queen, when it was decided that if the ship's anchor and propeller did not get her off at the next high tide the cargo should be jettisoned. And to this end the ship's engines were reversed, and both them and the steam-capstan worked at full speed for about two hours and a half, and until after high water, but without moving her. Accordingly, between 2 and 3 o'clock in the morning, a request was sent from the ship to the Astoria that she should go to Cape Disappointment and get some soldiers to aid in throwing over the cargo, but those on board, including Noyes, the Astoria agent of the ship, thinking it doubtful if any sufficient number of soldiers could be obtained at the cape, and also concluding that it was not safe to attempt to move in the dark, the tug did not leave her anchorage until 4 o'clock in the morning, when she returned to Astoria, where Noyes procured 40 laborers, and returned on the tug to the ship with them about 9 o'clock in the morning. The Astoria also took down a scow, and anchored it in the vicinity of the ship.

The tugs Pioneer and Brenham laid at Astoria all night, and returned to the ship about 7 or 8 o'clock on the morning of the 5th. On the same morning the tug Columbia was lying in Baker's bay, and the master, Alexander Malcolm, having been informed that the Queen was ashore, went to her aid about half past 5 o'clock and anchored. Soon after, at a request from the ship, the tug returned to the cape and brought back 24 men and a surf-boat, and then took the small remainder of the Queen's passengers to Astoria and returned to the ship about 11 o'clock. The crew of the Queen commenced throwing over cargo about 5 o'clock in the morning, and continued to do so until about 11 o'clock, aided by the men from Astoria and the cape as soon as they arrived. At first they discharged through the forward and after ports; but between 9 and 10 o'clock the starboard after-port had to be closed on account of the rising of the tide and the list of the ship to that side.

The libelant George Flavel is a seaman and master mariner of experience, and has been familiar with the entrance to the Columbia river, as the owner and manager of pilot and tug boats thereabout, for more than a quarter of a century. As the managing owner of the tugs Brenham, Columbia, and Astoria, and the managing agent of the tug Pioneer, he went to the assistance of the Queen on the morning of the 5th, and after boarding her had a consultation with the master of the ship and Mr. Perkins, substantially, according to the testimony of the latter, as follows: The master of the Queen said to Flavel, "We are in a tight place," and asked him what he thought of it. Flavel asked what we had been doing, and I spoke and said we had been throwing cargo overboard since daylight, and that we had an anchor out on the port quarter upon a 120-fathom

line, and that "we had held her in that position." Flavel said that was all right. "I asked him what the chances were for getting us off, and he said he did not know; that he would do his best." We chatted then a few moments and Flavel said: "All right; I will go on board and do what I can." I said: "All right; go on board and use your own best judgment, and do the best you can to rescue the ship, and we will do the best we can to look after her."

About half past 11 o'clock Flavel returned to the tugs in the lifeboat, and caused the Brenham and Pioneer to be made fast to the ship's stern, by passing their hawsers through her port quarter and stern chocks, respectively, and then the Astoria gave her hawser to the Brenham, in which condition they pulled on the ship near an hour. The flood-tide was setting in pretty strong across the track of the tugs, and made it difficult to keep them in position. The Brenham and Pioneer, by reason of the current and swell, were driven together and materially injured, and were in danger of being very seriously injured, if not sunk. About 12 o'clock the Brenham's hawser—a large towing one—parted, and she and the Astoria were separated from the ship. The Columbia then attempted to give her hawser to the Queen, but failed, when Flavel boarded her and succeeded in making her fast to the ship in the place of the Brenham, along-side of the Pioneer. The Astoria was then placed in front of the Columbia, and the Brenham in front of the Pioneer, and the four tugs, thus placed, pulled at the ship from a half to three quarters of an hour, and until high water slack, when she came off the spit on an uneven keel with a list to port, rolling and striking the bottom, but in an uninjured condition, and proceeded on her voyage.

On leaving San Francisco the Queen drew 16 feet 3 inches forward, and 18 feet 2 inches aft, though owing to the consumption of coal on the voyage she must have lightened some before stranding, but how much is not shown. From the testimony of the river pilot—Stevens—who took charge of the ship at Astoria on the 6th, it appears that her draught aft was then nearly 17 feet and the draught forward was probably reduced in the same proportion.

The diameter of the ship's wheel is 16 feet, and, according to her model in evidence, the center of the hub, which is three feet in diameter, is nine feet above the line of the keel. At low water, the hub, when not covered by the swell of the sea, was clearly visible, from which it is rightly inferred that the ship had then not more than eight feet of water under her stern, when on an even keel. Her engines were rated at 3,000 horse-power, but were never worked beyond 2,100 or 2,200 horse-power. The engineer testifies that he commenced to work them about 12:40 P. M. of the 5th, but, as the wheel was buried in the sand, they worked slowly until it was cleared. They were working at their full capacity when the ship came off, and had been for the half hour immediately preceding. The engine that worked the steam-capstan, to which the anchor line was attached, is

about 50 horse-power, and was also working at its full capacity when
the ship came off the spit. The combined power of the four tugs is
a little over 1,100 horse-power, and the position they occupied with
reference to the ship, when they first commenced pulling on her, was
four points or less off her port quarter, but for some time before she
came off it was about two points off said quarter.

In my judgment, Flavel acted wisely in keeping the tugs well off
the ship's quarter, rather than astern,—at least, until the moment of
high water, when she was expected to come off, if at all,—for by that
means she was worked sideways in her bed, and thus freed from the
pressure of the sand-bank which had naturally formed around her
quarters and under her stern, and so far barred her way off the spit.
And being unable by her own power, or any power applied directly
astern, to work herself in her bed and break up this sand-bank in
which she was imprisoned, it is altogether improbable that the Queen
would ever have gotten off the spit by her own unaided efforts, or by
any aid short of that furnished by Capt. Flavel.

According to the tide tables for the Pacific coast, published by the
"U. S. Coast and Geodetic Survey Office," the second high water at
Astoria, on September 4, 1883, occurred at 2 : 13 p. m., and the water
rose 8.9 feet. The first high water on the next day occurred at 2 : 37
a. m., and measured 7.4 feet; and the second one at 2 : 39 p. m., and
stood at 8.7 feet. The tides continued to decrease in height until the
10th, when they stood at 5.9 and 7.4 feet. By the "tide constants,"
given in the appendix to these tables, it appears that the high tides
on the fourth and fifth of September occurred at "Clatsop (near Point
Adams)" only seven minutes sooner than at Astoria, and were one-
tenth of a foot lower. Counsel for the claimant assumes that the
facts stated in this "constant" are true. But I do not understand
that they are put forth as being anything more than approximately
true, and in this instance they appear to fall far short of even that.
Point Adams, at the nearest point, is over three miles from the place
where the Queen was stranded, in a direction nearly E. S. E., and
the tide is full at the latter place probably sooner than at the former.
Capt. Harris, of the life-saving station at Cape Disappointment, tes-
tifies that the tide is 35 to 40 minutes earlier at the cape than As-
toria, and that a steam-boat leaving the former place on a high tide
will ordinarily carry it with her to Astoria. There is no direct evi-
dence of the distance from the cape or the spit to Astoria, but there
are a good many circumstances bearing quite directly on the ques-
tion, and I think the fact is of that character that the court may
take notice of it. By the chart of the mouth of the Columbia river,
"Sheet No. 1," published by the United States coast survey, 1881, it
appears that Astoria is about ten miles from Cape Disappointment,
and about eight from the point where the Queen was stranded. Now,
if the tide wave or swell moves from the cape to Astoria in 40 min-
utes, or a mile in four minutes, the tide would be high at the spit

about 32 minutes sooner than at Astoria. This conclusion accords with common observation and experience, while the statement that the tide wave moves from the spit to Astoria in seven minutes, or at the rate of a mile in seven-eighths of a minute, is contrary to both and improbable on its face. According to this conclusion, it was high tide on the spit, on the afternoon of September the 4th, at 1:41, and on the afternoon of the 5th at 2:07. It may, then, be regarded as morally certain that the Queen went on and came off the spit at high water slack.

During the 4th and 5th the weather was very thick, although the fog lifted some at times, and the night very dark. Around the Queen there was constantly a choppy sea, with a swell of about six feet, with an occasional tide rip or light breaker on her stern and starboard quarter, at low tide.

According to the observations recorded by the signal service at Fort Canby, the wind on September 4th was steady from the north at the usual times of observation, namely, 3:52 A. M., 11:52 A. M., and 7:52 P. M., at the rates of five, six, and seven miles an hour. On the 5th it was steady from the north at the first observation, at the rate of seven miles an hour; and at the second and third ones steady from the south at the rates of twelve and eleven miles an hour; and on the 6th it was steady from the south-east, at the first observation, at the rate of twelve miles an hour; and at the second and third ones steady from the south at the rates of eighteen and six miles an hour. Capt. Harris testifies that on the 6th there was a gale blowing from the southeast at Cape Disappointment, and a surf on the spit that would have made it very dangerous for the Queen if she had been there.

The Brenham, Columbia, and Astoria are wooden vessels. and draw about 10 feet of water each. The first is about 100 tons burden and 240 horse-power; the second is about 90 tons burden and the same power; and the third is about 125 tons burden and 300 horse-power. The Pioneer is an iron vessel of about 100 tons burden and 325 horse-power, and draws nine and a half feet of water. They were each manned with a master and sufficient crew, amounting in all to 23 persons. The only evidence in relation to their value is found in the testimony of the libelant, Flavel, and he estimates the value of the Brenham at $25,000, the Astoria at $15,000, the Columbia at $35,000, and the Pioneer, he says, is held by her owners at $60,000,—making in all the sum of $135,000. These estimates are somewhat general, and, for the purposes of this case, I find the value of the tugs to be $100,000. The cost of repairing the same, on account of the injuries sustained by them while engaged in pulling the Queen off the spit, including the value of four hawsers, either cut or broken in the operation, according to the testimony of Flavel, is $3,386.84, to which he adds $1,000 for repairs yet to be made to the Pioneer.

These tugs are maintained by their owners, primarily, for the purpose of towing vessels in and out of the Columbia river, and not the

business of wrecking. But, nevertheless, they are kept prepared for such service when needed, and their presence and maintenance about the mouth of the river is a very material security and benefit to the commerce of the Columbia.

The Canby and Miles are wooden vessels—the first one of 76 tons measurement and 8 feet draught, and the second one of 136 tons measurement and 11 feet draught. The scow is 50 by 20 feet, deck dimensions, and 4 feet deep in the hold. They were each duly manned, and the number of the crews amounted in the aggregate to 19 persons. The Canby is admitted to be worth $15,000, and the Miles is alleged to be worth $47,000, and the Scow $600; but, for the purposes of this suit, I find or assume that they are worth, collectively, $50,000.

In his testimony, the master of the Queen endeavors to show that the tugs under Flavel's charge were so badly managed that they were but little if any assistance to the Queen, and that, in fact, she floated off at high water with the aid of her anchor and machinery. But this view of the matter is opposed to the undoubted and controlling circumstances of the case, and contrary to the weight of the evidence generally. It is also in direct conflict with the contemporaneous and unpremeditated statement of the master contained in a card of thanks dictated by him to the editor of the *Daily Astorian* on September the 5th, and published over his signature as "Capt. Queen of the Pacific," in the issue of that paper of the seventh of the same month. In it, after premising that he wishes to return his "sincere thanks for the prompt courage" shown by so many "in aiding the Queen of the Pacific," he says:

"My special thanks are due to Al. Harris, (of the life-saving station;) to J. H. D. Gray, who stood by and helped from the start; to George Flavel, to whose determination we owe the safety of the vessel; to his experienced pilots; to the brave men who took off the passengers; and to the citizens who kindly cared for the passengers and provided them with all they required. The services of all were of the best nature, and are gratefully acknowledged. I shall ever hold them in remembrance, and again desire to express my sincere thanks."

On the same occasion the master publicly toasted Flavel as "the man who saved the Queen."

Now, after making all due allowance for the kindly and grateful mood in which this toast was probably drank and card published, it is impossible to reconcile what is said in either of them concerning the person "who saved the Queen," or "to whose determination" "the safety of the vessel" was due, and the evident drift and purpose of the master's subsequent testimony, and particularly with certain statements therein. It is easy to see that the card and the toast came from the heart, and the testimony from the head. The one is the spontaneous and unqualified statement of the witness' feelings and convictions cotemporaneous with the occurrence, while the other is plainly the studied and calculated afterthought in which he under-

takes to depreciate, as far as possible, the character and benefit of the libelant's services, with the intention, apparently, of diminishing their value in this suit.

It is also assumed in the argument for the claimant that the Astoria refused to assist the Queen in the effort made to get off on the morning of the 5th. But the evidence is satisfactory that no request for such assistance was sent to the Astoria that night, nor any other than the one to go to the cape and get men to help to throw over the cargo. The claimant also contends that the Queen moved astern at high tide on the morning of the 5th. The third officer testifies that by the use of the lead he observed her move astern about "nine feet." The master says she either moved or the anchor came home, but he does not say which, and gives no reason in support of either conclusion, save hearsay and conjecture. But the weight of the evidence and the probabilities of the case are decidedly against her having moved. Capt. Harris, who was on board at the time and took pains to observe the hawser, thinks she did not move until she came off. Neither did the master or any one else mention the fact, or even allude to it, when Flavel went on board the Queen to confer with him and ascertain her condition before going to work to try to get her off. And it seems to me highly probable that if the vessel had moved any appreciable distance during that tide, it would have been generally known or reported on board, and that it would have been mentioned to Flavel on this occasion as a material if not a hopeful circumstance. But if she did move a short distance—nine or even forty feet—this fact does not tend to show that her position was any the less dangerous, or that the service rendered her by the salvors was any the less valuable. The vessel did not come off, that is certain; and the only rational explanation of the fact, if it be a fact, is, as suggested by counsel for the libelants, that instead of being on a sloping bottom she was in a "pocket," or sink in the sand, and therefore in the more danger.

As a general conclusion from these premises, I find that the libelants, and the intervenors Gray and others, performed a salvage service in aiding to get the Queen off Clatsop spit, without which she would have been buried in the sand there long ere this; that the scow and the tug Canby, and particularly the four tugs employed in pulling the Queen off the spit, incurred material risk, and that the salvors, according to the respective positions and employments, displayed skill, judgment, and courage in saving the Queen, and taking off and removing to a place of safety her passengers, their baggage, express matter, and mails; that Capt. Gray, by his wise forethought and skillful appreciation of the Queen's situation, in taking the scow to the ship, as he did, for the purpose of getting out an anchor, and the attention and aid he gave to the doing of the same, contributed very materially to the saving of the vessel; that Capt. Flavel, by the skillful, courageous, and determined manner in which he maneuvered the four

tugs under his control on the 5th, under circumstances of more or less risk to them and to himself personally, rendered a very great service to the Queen, without which in all probability she would have been a total loss.

And the important question now to be determined in the case is the amount to be allowed the salvors. But preparatory to that, and as a part of it, the defense made by the claimant to the claim of the intervenors, Gray and others, must be considered and disposed of. This defense turns upon the effect to be given to what occurred between Gray and Perkins at Astoria on the morning of the 6th. The parties are substantially agreed in their account of the transaction, except in one particular. Briefly and substantially it was as follows: Mr. Perkins asked Capt. Gray to make out a bill for his services; that he wanted to get away to Portland. The latter wanted to know first if Flavel was going to settle, and the former said he thought he would, whereupon Gray made out his bills and presented them, and they were paid to him accordingly. Gray swears that when he presented the bills to Mr. Perkins he said, as he did so, these bills are for "services," but if there is a suit for "salvage," I want to come in with the rest; to which the latter replied, the bills are very reasonable, and shall be paid; and if there is any suit for salvage, you shall share with the rest. Mr. Perkins swears that he has "no recollection" of Gray's saying anything about any further claim in case of a suit for salvage, but that he volunteered the remark, when he received the bills, that if Flavel did not settle, and the case went to the court for adjudication, he was willing the court should "review" Gray's claim, if it could be done without hazarding the interests of the company.

It does not follow that because Mr. Perkins does not now recollect what Capt. Gray affirms he said, that the statement of the latter is not proven. But, admitting that it is not, I think the bills were presented and paid under the apprehension that Flavel was going to settle on the basis of "service," rather than "salvage," and that there would be no suit about the matter; but if it should turn out otherwise, and there was a proceeding for salvage, that Gray and others should not be prejudiced thereby.

Another point is made by the claimant as bearing on the question of the amount of the salvage, and that is: the service of the salvors was not voluntary, but rendered in pursuance of a request or employment on the part of the claimant. The authority cited in this connection is the case of *The Undaunted*, Lush. 90, 92. But the ruling in this case is only to the effect that, when the services are rendered in pursuance of a request from a vessel in danger or distress, the party rendering them is entitled to recover salvage, according to the circumstances of the case, although such services prove to be of no benefit, while one who volunteers his services to a vessel under the same circumstances, if unsuccessful, is entitled to nothing. But in

either case the law implies that the service is to be paid on the usual condition of the ultimate safety of the property in question. *The Versailles,* 1 Curt. 360. And whether the fact of a request shall affect the amount of the compensation for a salvage service must therefore depend upon the degree of danger in which the vessel is placed. If she is in no danger of destruction or serious damage, but only some slight injury, she may be a reasonable security for a salvage service rendered her upon request, although it should prove of no benefit to her. In such a case, compensation not depending on success, the amount of salvage may very properly be diminished accordingly. And, although not suggested in the argument, it may be admitted that if Mr. Perkins, as the general agent of the claimant, did in fact employ the salvors, on the credit of the Pacific Coast Steam-ship Company, to assist in the rescue of the Queen, assuming the solvency of the company, the risk of getting nothing for their services, if unsuccessful, would not enter into the transaction, and should not be considered in estimating the amount of their compensation. But nothing of that kind took place on this occasion. Certainly, neither the request sent to Flavel from the Queen for his tugs, which was only a more direct form of a signal of distress, nor the conversation between him and Mr. Perkins on the deck of the ship, in which the latter told Flavel, substantially, to do what he could to get the ship off and they would look after her, amounts to even an implied contract whereby the Pacific Coast Steam-ship Company became bound to pay the libelants for their services as salvors whether they were successful or not. But it also appears, from the master's testimony, that Mr. Perkins said to Flavel on this occasion, "We want your assistance—we make no bargain—we will do nothing;" from which it appears that the agent of the claimant, while accepting the services of the libelants, expressly declined to make any agreement concerning their value, or to bind his principal to the payment thereof in any contingency.

In the absence of an express contract to the contrary, or circumstances from which such contract is necessarily implied, the presumption is that the salvors went to work with the understanding and expectation that they would get their compensation, if any, in the usual way,—off the bed-rock,—out of the property saved. And there being no such contract or circumstances in this case, the salvors would have had no claim for salvage, if unsuccessful in their efforts to save the Queen, because she was in a peril from which she must have been wholly saved or become a total loss. So it is immaterial in this case whether the service of the salvors was rendered upon the request or employment of the ship or not. The service was a salvage one, and they could only look to the saved property for their compensation.

Nothing remains but to determine what compensation ought to be allowed the salvors. And this is always the perplexing question in these cases. Every case must turn largely on its own circumstances,

and, in the nature of things, the award, like the verdict of a jury in a case for damages, is somewhat arbitrary, and only approximately right and just. The value of the property saved is $736,786.84, and the libelants claim that the award ought to be equal to 20 per centum of that amount, or about $150,000. The claimant has not directly suggested what amount ought to be allowed for the service, but, from the awards made in the cases cited by counsel as furnishing a proper precedent or safe guide on this point, it appears that he is willing to allow from $25,000 to $35,000.

In awarding compensation for a salvage service, the courts do not stop at mere payment for the work and labor performed, but go further, and give the salvor an appropriate reward, in the interest of commerce and navigation. 2 Pars. Shipp. & Adm. 292.

In *The Versailles*, 1 Curt. 355, Mr. Justice CURTIS says:

"The relief of property from an impending peril of the sea by the voluntary exertion of those who are under no legal obligation to render assistance, and the consequent ultimate safety of the property, constitutes a technical case of salvage; and when its compensation is not fixed by such a contract as a court of admiralty will enforce, it is to be adjusted according to those liberal rules which have been found beneficial to commerce, and have long formed a part of the marine law."

In determining the amount of the compensation for a salvage service the elements which enter into the estimate are: (1) The value of the property saved and that employed in saving it; (2) the degree of peril from which the saved property is delivered; (3) the risk to which the person and property of the salvor is exposed; (4) the severity and duration of his labor; (5) the promptness with which he interposes his services; and (6) the skill, courage, and judgment involved in them. *The Versailles*, 1 Curt. 361; 2 Pars. Shipp. & Adm. 293.

In all these particulars, save two,—the risk to the persons and property of the salvors, and the severity and duration of their labor,—this is a case for a large award. The property saved is of great value, and it certainly was in extreme peril, and that it could be saved at all was very improbable. The salvors acted promptly, and with great skill and good judgment; and while, on the whole, the risk sustained and the labor performed by the salvors was not very serious or severe, yet they were so material as to be well worthy of consideration.

After careful consideration of the whole matter I have concluded to award the salvors the sum of $64,700, or a little less than 9 per centum of the value of the property saved, to be distributed as follows: For repairs on the Brenham, Columbia, and Astoria, including a new hawser to each, the sums of $820, $1,120, $560, respectively, and to the Pioneer on the same account, $700; to the tug Pioneer and its crew, $14,000; and the tugs Brenham, Columbia, and Astoria, and their crews, $27,000; to the tug Canby and its crew, $4,500;

the tug Miles and its crew, $500; and the scow and its crew, $500. From the sums awarded to the several tugs and their crews, except the Miles, there must first be paid to each of the persons composing said crews on the fourth and fifth of September a sum equal to the following multiple of the monthly wages he was then receiving or was entitled to receive for ordinary service in a similar capacity: To each master, or person acting as such, eight times a month's pay; to each pilot and engineer, or person acting as such, six times a month's pay; to each mate, or person acting as such, four times a month's pay; and to each seaman, or other person of said crews, two times a month's pay.

From the sums awarded to the Miles and the scow, and their crews, there must be first paid to the persons comprising the latter as follows: To the master and pilot of the Miles, $70; to the engineer, $50; to the mate, $30; and to the fireman, three deck hands, and the cook, $20 apiece; to the foreman of the scow, $60; and to the three deck hands, $40 each.

The remaining portion of the award, $15,000 is allotted to Capt. Flavel and Capt. Gray,—two-thirds to the former and one-third to the latter. The conduct of both these men on this occasion was highly meritorious and commendable, and deserves, in my judgment, special recognition in this award. Nor ought the fact to be overlooked, in this connection, that the latter has but one arm and the former is crippled in both hands. And, looking at Capt. Flavel's relation to this subject generally, as well as in this particular transaction, by the light of what is commonly known in this country, as well as the evidence in this case, it may be justly said, substantially, in the language of counsel, that the enterprise and gallantry displayed by him on September 5th was such as would reflect great credit on a much younger and abler man than himself. It is not common to find a man of 63 years of age, crippled in his hands and well able to live without labor, who will exert himself and incur the risk of bodily harm that Capt. Flavel did on this occasion. And his conduct was praiseworthy throughout. When his tugs were being seriously damaged, and their destruction seemed not improbable, he did not attempt to drive a bargain with Mr. Perkins for indemnity in case he was unsuccessful. But, regardless of consequences and determined to save the ship if possible, he persisted in his efforts, and by his presence and example directed and encouraged his men, and shamed them out of their very natural and reasonable apprehensions. Indeed, he was largely animated by a higher motive and purpose than the hope of obtaining any pecuniary reward. As is well known, the people of Oregon and adjoining territories were about to celebrate the completion of the Northern Pacific Railway. Distinguished persons from all parts of the world were bound here to participate in the event, some of whom were on the Queen. That this valuable vessel should become a wreck on our shores at such a time was regarded by all

concerned as a calamity to the country. Capt. Flavel shared this feeling, and as a matter of state as well as personal pride was willing and did make exertions and take risks that under other circumstances he might well have declined.

For nearly 35 years Capt. Flavel has been engaged in the business of pilotage, towage, and salvage about the mouth of the Columbia river, and within the jurisdiction of this court, and has never once sought the aid of the same to enforce a claim for such service. The reasonable and obvious inference from this fact is that his demands have not been extortionate or oppressive.

In the decree, provision must be made for deducting the sums heretofore ·paid the intervenors, Gray and the Ilwaco Steam-ship Company, for their respective services from the amounts awarded to them, and for the payment of the remainder only, and for the filing with the clerk of a stipulation by the' owners of the tugs and scow, and the members of their several crews, containing a schedule or statement of the position or employment and monthly pay of each one of such crews, as a basis upon which the award shall be so far distributed. And in case such stipulation is not filed within 20 days thereafter, as to any of said tugs or crew, the matter may be brought before the court for determination on the petition of the person interested.