JOHN D. SPRECKELS & BROTHERS COMPANY *v.* THE STEAMSHIP "NEVADAN" and AMERICAN HAWAIIAN STEAMSHIP COMPANY.

DECIDED: APRIL 6, 1903.

1. Where a large freight steamer, the Nevadan, is stranded on a coral reef in the channel of Honolulu harbor for two hours and a half,

and is finally relieved from her peril through the efforts of a steam tug, the Fearless, and said steamer Nevadan slips off the reef into deep water and starts out to sea dragging the tug (which is still attached to her by the hawser), stern foremost; *Held,* that this was a part of the *res gestae,* and was a danger incurred by the salving tug which should be considered in estimating the character of the salvage services rendered.

2. No vessel lying on a reef is in a position of safety; and it is not necessary to constitute a salvage service that the distress in which a vessel is in should be immediate or the danger absolute. It is sufficient, if at the time the assistance is rendered, the vessel has encountered any misfortune or danger which might possibly expose her to serious injury.

### In Admiralty.    Libel for Salvage.

*Hatch & Silliman, Holmes & Stanley,* for libellant.
*Kinney, McClanahan & Bigelow,* for intervenor.

This is a libel for salvage, filed on behalf of J. D. Spreckels & Brothers Company, as owner of the steam tug "Fearless," and for the master and crew thereof, for salvage services alleged to have been rendered to the steamship "Nevadan" on the evening of the 8th day of December, 1902, when the said steamship "Nevadan," while proceeding down the channel from the port of Honolulu, Island of Oahu, Territory of Hawaii, to the port of Kahului, on the Island of Maui, went ashore upon what is known as the "Miowera" reef, on the west side of the channel, at a point distant about sixty yards from the buoy known as the "can buoy;" the said steamer being aground on the said reef at a point about one hundred feet from the stem of the said steamer.

The American Hawaiian Steamship Company, the alleged owner of the "Nevadan," intervened and filed an appearance and claim and answered the libel herein.

The facts in the case briefly appear to be the following:

The steamship "Nevadan" is owned by the American Hawaiian Steamship Company. It has a gross tonnage of 4408; length of 360 feet; depth 24 feet; beam 46.2, and its draft is 16.2 forward and 15.7 astern. On the evening of the eighth

of December, 1902, at or about the hour of 6:30 o'clock p. m., the said steamship left the port of Honolulu, bound upon a voyage to the port of Kahului, on the Island of Maui, in the Territory of Hawaii. She was in command of Henry F. Weedon, her captain, and with no licensed pilot aboard. The captain admittedly held no license as pilot for the port of Honolulu, until March 12, 1903, (some months after the stranding of his vessel) on which date a pilot's license was issued to him for, as appears in said license, "previous experience on ocean steamers," by the United States Local Inspectors for the District of Juneau, Alaska, then at the city and county of San Francisco, State of California. (Libellees' Exhibit "G.")

While said steamship was proceeding down the channel at the entrance of the harbor of Honolulu, she stranded upon a well known reef called the "Miowera" reef, on the west side of the channel. This was about 6:45 p. m. The accident to the "Nevadan" was witnessed by the Young Brothers, who are engaged in the launching and general boatman business at this port. One of them, Herbert Young, went out to the "Neyadan" to tender his services, and Captain Weedon told him to go in and get the "Fearless," which he did.

The "Fearless" is a steam tug belonging to the libellant corporation herein, and engaged in the general towing business in the port of Honolulu, and incidentally thereto the salvage business. It is a very large tug, having a length of 99.6 feet, a tonnage of 160, breadth of beam 22.75, a draft of 12.2 feet, and 600 horse power. This tug is constantly ready, so far as its apparatus and machinery are concerned, to go out either as a tow boat or to rescue vessels from danger, either actual or impending. The tug always has her fires banked so that she can get up steam as was testified to, from within "five to fifteen minutes," depending upon the necessities of the case. Her usual crew is ten men. On the evening of the 8th of December, 1902, the "Fearless" was notified by one of the Young Brothers that she was wanted by the "Nevadan" to help her out of her predicament, and immediately started out to the "Nevadan," with

a crew of seven men, including the captain, aboard. This crew consisted of Captain Olson, G. Scott, the engineer, the assistant engineer, whose name was not disclosed by the testimony, S. P. Murphy, the mate, Hearst, a deck hand, and Williams, a deck hand employed to act as such on that evening, and the Chinese fireman.

In the meantime, the "Nevadan" had put out a kedge anchor with the assistance of the gasoline launch of the Young Brothers, and had hove it home; and had again ran the kedge anchor out for the second time across the channel and embedded it in the coral on that side of the channel. She had been on the reef an hour or more before the tug reached her, and had been making efforts to release herself by the emptying of over a hundred tons of water from certain forward water ballast tanks, and the filling of the after tanks, in addition to the dropping of the kedge anchor, weighing some nine hundred or more pounds.

When the "Fearless" came alongside, and asked if assistance was needed, some conversation ensued between the two captains as to the payment for the services to be rendered. There is a serious conflict in the evidence on this point. Captain Olson claims that he said he would take her off for five thousand dollars, while Captain Weedon states that the amount suggested was $1000. No agreement, however, was entered into, for Captain Olson left the "Nevadan" and steamed out into the channel and turned round. After some little time she came back, when Captain Weedon called to Captain Olson to "give him a line," or to "pass his hawser aboard," or words to that effect. With some little difficulty, owing to the fact that the line attached to the kedge anchor and to the "Nevadan" was lying straight across the channel, and which had to be cut by the "Fearless" in order to avoid getting her propeller wound up in it, the tug finally was made fast to the steamer. As soon as this was done, namely, about 7:45 p. m., the tug took her position dead astern of the steamer and began pulling. This was continued for over an hour, the tug changing her position towards the last and veering more across the channel at right angles to the "Nevadan," when that vessel finally came off the reef and started out

the channel to the open sea, pulling the tug, stern foremost, behind her. This was about 9:05 or 9:10 p. m.

The weather was somewhat cloudy, but not unusually so; the sea was comparatively smooth, with the exception of blind rollers surging in towards the reef upon which the "Nevadan" lay; the night was dark, and there was little or no wind until about 8:30 or thereabouts, when a fresh breeze came up.

The "Nevadan" is of the value of about $350,000. Her cargo was of the value of $64,248. She had in addition to this cargo, some 2500 barrels of oil on board, but as to the value of this no testimony was introduced. The tug was shown to be of the value of $75,000, kept up at a monthly expense of three thousand dollars.

"Salvage is the compensation allowed to persons by whose assistance a ship or her cargo has been saved, in whole or in part, from impending peril at sea, or in recovering such property from actual loss, as in cases of shipwreck, derelict or recapture." *The Blackwell,* 10 Wall. 1; *McConnochie v. Kerr et al.,* 9 Fed. 50, 53; *Murphy et al. v. The Ship Suliote,* 5 Fed. 99.

In determining the amount of salvage to be awarded in any given case, many elements are to be taken into consideration; among them being the value of the property salved and the degree of danger from which it was rescued; the value of the property employed by the salvors and the risks incurred by such salvors in rescuing the property salved from danger; the labor expended by the salvors and the skill and energy displayed in rendering the salvage services. *The Mary E. Dana,* 17 Fed. 353; *The Queen of the Pacific,* 21 Fed. 459; *The Glengyle,* Eng. Appeal Cases (1898), 519.

It must be admitted beyond a doubt that the "Nevadan" was in danger when she lay on this reef with her valuable cargo aboard. Ships are made to sail the sea, not to navigate the land. The reef where she lay is composed of sand and coral, and the waters about it are full of boulders. The reef has a gradual slope of some thirty feet. It rises "like a precipice, or *pali,* up and down." This latter fact was testified to by the witness, Wil-

liams, who swore to having been often round this reef fishing for lobsters.

No vessel lying on a reef is in a position of safety. It is the common knowledge of all seafaring men that where there is a reef there is a heavy sea, if there is any sea at all running. Indeed, the Official Map of the Harbor of Honolulu, introduced in evidence and marked "Libellant's Exhibit 3," indicates this reef with the following words: "always breaks." And the least sea would raise a ship lying in the position in which the "Nevadan" lay, so that when she fell, she would strike heavy and would be likely, if she remained long on the reef, to pound to pieces. Fortunately there was no unusual sea on the night the vessel was stranded.

It is, however, not necessary to constitute a salvage service, that the distress in which a vessel is in should be immediate, or that the danger should be imminent or absolute; it is sufficient, if at the time the assistance is rendered, the vessel has encountered any misfortune or danger which might possibly expose her to destruction or serious injury, were the services not rendered. *The Charlotte*, 3 W. Rob. Adm. 6; *The St. Paul*, 86 Fed. 340.

As was said by Judge Lacombe of the Southern District of New York, in the latter case, where the "St. Paul," a steamer of 1224 tons register, had stranded on Long Island, (quoting from page 343)—

"There was, of course, no 'imminent danger,' possibly no remote danger, of her breaking up. She had made a bed for herself in the sand, her keel resting on a substratum of tough clay, and, so far as the proof shows, although there were rocks near her, there were none under her. The water was likely to cut out the sand at one place and heap it up at another; but, although that would subject the ship to unequal strain, it may be that she was too strongly built to break her back, so long as her keel rested on the clay. But, even if, as appellant contends, she might have remained there in safety for an indefinite length of time, we cannot accede to the proposition that she was not thereby exposed to risk of loss...... While she lay on the Jer-

sey beach, she was making nothing for her owners, either in money or in reputation, but quite the reverse, and her value as an ocean liner was certainly exposed to great risk of deterioration."

A decided effort was made at the trial of this case to show that the "Nevadan" came off the reef by her own efforts. This is not borne out by the facts. The "Nevadan" had been on the reef for some time, a full hour before the tug took hold of her, and she had tried to get off by all means in her power and with the assistance of the Young Brothers' gasoline launch, but she remained fast. After the "Fearless" commenced tugging on her, she still remained fast for another full hour or more and she only came off when the tug changed her relative position to the ship, by veering across the channel a little more at right angles with the "Nevadan." It is easy, and indeed usual, after a ship is out of danger for the officers who are most to blame in incurring such danger, and when it is a thing of the past, to claim all the credit for relieving the ship. It is true that the engineer of the "Nevadan" had gotten up steam in both her boilers, and a kedge anchor had been placed across the channel and hove home once; all with the hope of pulling her off by this means and by the lightening of her forward ballast, by emptying the forward tanks, and the increasing of her after ballast by the filling of the aft tanks. But this had no appreciable effect upon the condition of the ship. It is in evidence also that just before the "Nevadan" came off the reef, the steam having been equalized in both her boilers, the engines of the "Nevadan" were started immediately both dead astern, with an average steam pressure of 175 pounds. It is claimed by the captain and engineer of the "Nevadan" that it was due to this fact alone the vessel yielded and floated out into the channels, as for over half an hour previous the engines had not been working.

The fact that the engines were started astern just about the time the vessel came off the reef may have had some influence in the final moving of the ship and may possibly have contributed to that result, but this can never be absolutely demonstrated. It remains true that the "Fearless" had been working from

"7:46 p. m.," as appears by the ship's log book, until "9:05 p. m." pulling steadily in a series of jerks. Says Murphy, the mate of the "Fearless," "We started to jerk on her; we would go ahead full speed, and wait a little and then go ahead again."

This was kept up until the ship was finally off the reef, possibly at or about the time the engines were started astern. It seems to me that without the tug or some other equally potential power outside of the vessel, as shown by the facts in this case, the "Nevadan" would never have come off the reef. That this was evidently the opinion of Mr. Morse is clear. Mr. Morse is admittedly the freight agent of the intervenor at Honolulu, and was on board the "Fearless" at the time she went out to the rescue of the "Nevadan." He left the "Fearless" in a launch and went into town and interviewed Captain Whiting, the Naval Commandant of the Port, as to whether it would be possible to get the "Iroquois," a government steam tug, to go to her assistance. It is not stated why the "Iroquois" did not go, but it is in evidence that Captain Whiting stated that would take four hours to get up steam on her, as testified to by Mr. Morse. Whether or not Mr. Morse acted in an official capacity in interviewing the Naval Commandant is not a material fact in this case. That he was the freight agent of the company and the only official of the general agents at the scene of the disaster on the night in question is unquestioned, and his visit to the Naval Commandant is a significant one. It would seem that he thought the "Fearless" would be unable to pull the "Nevadan" off unaided by other vessels.

The "Fearless" was not occupied for any great length of time after she had made fast to the "Nevadan," in accomplishing the purpose for which she had been sent for, but as to this shortness of time, the "Nevadan" should not complain. It would seem to have been a matter of congratulation. The longer the vessel remained in her dangerous position the more likely was she to become seriously disabled. And as was said by Dr. Lushington, the eminent English authority on admiralty, "the patient should not complain of the shortness of the operation." *The General Palmer*, 5 Notes of Cases, 159.

Now as to the danger to the tug. It was night when the tug reached the "Nevadan" and made fast; there were no lights on the buoys in the harbor. And right here I would add that this is a matter of surprise to me. It appears that when the regular pilots take ships out of the port of Honolulu at night they place lights on the buoys along the channel; but when a ship goes out without a pilot, she must either go in the daylight or run the risks incident to the darkness, as no lights are on the buoys. It seems to me that this looks a little like a premium on the services of the local pilots.

The channel is a narrow and tortuous one, bounded on each side by coral reefs, and there was the possible danger to the "Fearless" of going on the reef herself that night, for in manipulating in the dark, the hawser might have broken or got wound up on the propeller of the tug, and in the shallow waters near the reef, the tug might have been drawn on to the reef. Says Murphy, the mate of the "Fearless:" "If the hawser had carried away, we were close in; we would have sped dead ahead upon the reef, like a shot out of a gun; nothing could have saved her."

But the hawser did not break, and the fact that no injury befell the tug at this point does not militate against the meritorious character of the services rendered by the tug in the face of what might have happened, which possibly was one of the risks incident to this employment. The serious danger to the "Fearless" in the estimation of the Court, arose from the fact that when the "Nevadan" slid off the reef into deep water, she immediately started out of the channel towards the sea, pulling the tug stern first after her, which fact caused the tug to list, as was testified to by several of the libellant's witnesses, in degrees varying from thirty-five to forty-five degrees; the tug at the same time shipping a great deal of water and being in danger of being capsized.

Captain Olson not only blew a signal of three blasts to notify the "Nevadan" to let go his hawser, but also called out to that effect. This signal was understood by the captain of the "Nevadan" and his officers, and that interpretation given it, as ap-

pears by the sworn answer in the case; although Captain Weedon made an attempt to shift in his testimony by stating that by the International Rules of Navigation, the signal given by the "Fearless" of three blasts, meant "I am coming astern." Under the circumstances, there is rather a grim humor in this interpretation, for there was no doubt the tug was "coming astern" in more ways than one. But, upon this point, Captain Weedon also testified that he had been a master of sailing ships for fifteen years, and that he had only been master of a steamship for from 18 to 20 months; and that during all of his experience as a sailing master he understood the signals in question to mean "let go my hawser."

But in addition to this, it appears that this signal was perfectly understood by the officers of the "Nevadan." The second mate, Lauriatt, stated that he heard the calls from the tug to let go the hawser, and dispatched a messenger, the boatswain, Mullins, forward to the captain for instructions as to what should be done.

There appeared to be no unnecessary haste on the part of the "Nevadan's" officers to relieve the tug's predicament. Mullins, the boatswain, testified that it was "fifteen minutes from the time of the first call until we let go the hawser." In the meantime, the tug was in her perilous position underway and being pulled out to sea, stern foremost. The hawser was taut, and the danger lay, as was expressed by the mate of the "Fearless," who was at the wheel, in the fact that "the boat had a big vessel pulling her stern foremost and she had no control of her engines... I couldn't control the boat....she would not answer her rudder."

It is claimed that the tug might have relieved her peril by cutting the hawser. This may be true, but in the excitement and peril of the occasion that was not done, although an order was given by Captain Olson to cut the hawser. One man, Williams, a deck hand, stated that he was too terrified to act, testifying: "I thought it was all day for me....I thought she was going down....and I ran forward ready to jump overboard and swim ashore."

It must be admitted that the danger the tug was in arose from her employment and was a consequence of her efforts to assist the ship off the reef, and was a part of the *res gestae*. It was evident that the "Nevadan" was not deemed quite out of danger when she started out the channel, moving at the rate of from three to four knots an hour, and continued to haul the tug stern foremost after her. Says Herbert Young, "she pulled the 'Fearless' stern first until she was outside of danger." While Captain Weedon testified upon this point as follows:

"The Court: It was not seamanlike, was it, to pull a little boat astern?

"A. No; but under the conditions we could not avoid it."

The only natural inference to be drawn from this is that in his anxiety for the safety of his own ship, the captain of the "Nevadan" was regardless of that of the tug.

Some time was devoted on the hearing, to prove that some sort of a contract was entered into between Captain Olson and Captain Weedon for the services to be rendered. It is true that the captain of the "Nevadan" and the freight agent of the American Hawaiian Steamship Company, Mr. R. P. Morse, the latter being aboard the "Fearless," both testify that Captain Olson said he would take $1000 to pull the vessel off the reef; yet no one else so understood Captain Olson, who, with five other witnesses on board the "Fearless," testified that if any offer was made, it was a $5000 one. All were apparently truthful, but there was certainly a mistake somewhere. Mr. Bray, a newspaper man, and Mr. Merry, both on the "Fearless," and both disinterested men, sustained Olson's testimony to the effect that Captain Weedon said he would only give $500, and that Captain Olson said he would charge $5000 for pulling the "Nevadan" off. I cannot, however, in estimating the amount of judgment in this case, base it upon any contract alleged to have been made. It must be estimated from a general salvage point of view simply, as there was no meeting of minds between the two captains sufficient to form a contract, and there was no contract.

"There is a marked and clear distinction between a towage and a salvage service. When a tug is called or taken by a sound

vessel as a mere means of saving time, or from considerations of convenience, the service is classed as towage; but if the vessel is disabled and in need of assistance, it is a salvage service. In cases of simple towage only a reasonable compensation is allowed, as upon a *quantum meruit*. In cases of salvage, the award is upon a broader and more liberal scale."

*The Flottbek*, 118 Fed. 954, 960; *McConnochie v. Kerr et al.*, 9 Fed. 50, where Judge Brown says, in making the distinction between towage and salvage cases, (P. 53):

"A salvage service is a service voluntarily rendered to a vessel needing assistance, and is designed to relieve her from distress or danger, either present or to be reasonably apprehended. A towage service is one which is rendered for the mere purpose of expediting her voyage without reference to any circumstances of danger." *The Veendam*, 46 Fed. 489; *The Grace Dollar*, 103 Fed. 668.

I shall not attempt to analyze the various cases submitted by counsel for libellant and counsel for libellee upon the question of the amount of salvage to be awarded. It is natural that in the one instance cases should be cited where the awards are very heavy, and on the other, cases where the awards are low. No two cases of this character are alike, and while the Court always pays due deference to the opinions of the Courts of Admiralty, yet in this case, as in all cases brought before it, its judgment must be controlled largely by the circumstances peculiar thereto.

The single question is, in view of all the circumstances of this case, what amount of salvage is reasonable, for the Court holds that the "Fearless" and the owners thereof, are undoubtedly entitled to a judgment of salvage. As was once said by the Supreme Court of the United States, "salvors' services should be seduously fostered; and hence they should receive compensation, not as mere pay for work and labor done, nor even as limited to the precise quantum of benefit in the particular case, but on a scale so liberal as to best encourage such services." *The Comanche*, 8 Wall. 448, 465.

The value of the property salved herein, both the vessel and cargo, is admitted to be some $414,248. I think a reasonable

salvage award would be an amount equal to one and one-half per cent. of the value of the salved property, or $6213.72, and so hold, the same to be distributed as follows:

To the captain of the "Fearless," $350; to Scott, the chief engineer, $150; to Murphy, the mate, $150; to the assistant engineer, $100; to the two seamen, Williams and Hearst, $75 apiece, and to the fireman, $50; the balance of $5263.72 to go to the libellant herein as the owner of the tug "Fearless;" together with costs in this suit incurred.

Let judgment be entered accordingly.