## THE FANNIE BROWN.

BAKER SALVAGE Co. and another *v.* THE FANNIE BROWN, etc.

*(District Court, E. D. Virginia. February 26, 1887.)*

1. SALVAGE—RISK—AMOUNT.
   Risk to the salvor, while it enhances the amount of the award, is not an essential element of salvage.
2. SAME—REWARD.
   Salvage is a reward decreed by a court of admiralty for services successfully rendered in saving property from maritime danger, by persons under no obligation of duty to render the services, and who voluntarily enter upon them.
3. SAME—AMOUNT—CIRCUMSTANCES.
   The amount of such award varies with the circumstances of each case.
4. SAME—SOUTH ATLANTIC COAST.
   On the South Atlantic coast, on account of its special dangers, the tendency to low rates of salvage should not be encouraged, and such services should not be degraded to the level of mere compensation for days' or hours' work.
5. SAME—NORTH CAROLINA COAST—SCHOONER—VALUE—TOWAGE—AMOUNT OF AWARD.
   A schooner worth, with her cargo, $18,000, became disabled in her sails and rigging, and anchored off Body island, on the North Carolina coast. After remaining there for four days awaiting better weather, and in close proximity to dangerous shoals, she was taken in tow by the wrecking steamer of libelants, who are professional wreckers, and had sent out from Norfolk, Virginia, in tempestuous weather, an expedition to her relief, and was towed into Norfolk, arriving barely in time to escape a heavy storm which came up im-

mediately afterwards, and which would probably have wrecked her. The court decided that this constituted a salvage service, and awarded $1,500 to the salvors.

(*Syllabus by the Court.*)

In Admiralty. Libel for salvage.
*Sharp & Hughes*, for libelants.
*W. W. & B. T. Crump*, for respondents.

HUGHES, J. The valuation of vessel and cargo in this case is fixed by agreement at $18,000. The primary question presented by the pleadings and evidence is, was the service rendered here a salvage, or simply a towage, service?

The case is important, in the fact of its being necessary for the court to pass upon the question of what constitutes salvage or no salvage on the Atlantic coast, south of the Virginia capes, and to give its reasons for deciding that question one way or the other. The case is one of a sort liable to arise on this coast any day in the year, especially in the winter season. The principal inquiry is, what was the condition and position of the defendant vessel when it received the services of the libelants? The facts showing this condition must be presented fully, and with some detail.

The Fannie Brown is a three-masted schooner, of nearly 500 tons measurement, very staunch and strong, only a few years old, and as good as new. She set sail from Baltimore on the first of January, 1887, bound for Charleston, rather more than half loaded, chiefly with coal, but partly also with mixed freights. She drew 12½ feet of water. While on her voyage, and after passing out of the Virginia capes, and when within 10 or 12 miles of being abreast of Currituck light, she sustained an accident to her spars and rigging which determined her master, Sharrett, to put back to Baltimore for repairs as soon as he could do so. He proceeded on, however, with such speed as he could, to a point 14 miles off Body Island light, N. E., where he anchored in 14 fathoms water, on what he calls the "elbow" which the Atlantic coast there makes in stretching south from Cape Henry around Cape Hatteras, in the direction of Florida. His object in getting to that elbow was that he might "have more points of the compass for any purpose." The accident to the Fannie Brown happened at about 4 o'clock on the morning of Sunday, the second of January. The vessel continued to beat southward for 10 or 11 hours before a wind blowing down the coast, and she reached the point on which she anchored off Body Island light at 3 o'clock on Sunday afternoon. The accident which befell the schooner was the breaking of her mainmast, and the consequences which attended it. While jibing the mainsail, the wind took the sail back, and set the boom up on its end, which, when it went down, brought with it 34 feet of the mainmast, and this, in falling, struck the mizzen-mast, breaking that off to 41 feet above deck. The mainmast was broken down to 55 feet above deck. The falling of the two masts produced a corresponding damage to the sails attached, and reduced the vessel to de-

pendence upon the foremast and its rigging for further progress and safety, until repairs could be effected.

The Fannie Brown lay at anchor off Body island from 3 P. M. on Sunday, the second, to about 11 A. M. on Thursday, the sixth January, when she was taken in tow by the steamer and wrecking vessel Victoria J. Peed, sent out by the libelants. The four days were spent by her crew of eight men, all told, in repairing damages, and improvising temporary rigging for the main and mizzen masts. Hardcastle, the mate of the schooner, says that by Wednesday night (the 5th) they had everything safely stowed and lashed, with gear up and sail on the mainmast, and one ready for the mizzen-mast, and had gear ready to hoist halyards to both, and sail bent on mainmast. Jellison, the mate of the Victoria J. Peed, says that when he went on board the Fannie Brown at about 10 o'clock Thursday morning, the 6th, she did not have her halyards on her mainmast and mizzen-mast, but there was on each a single block, not sufficient to haul a sail up. They had not reefed the main and mizzen sails. Part of the mainmast stuck over the rail 20 feet. Her mainsail was torn, and lay as it had fallen, along the rail, and had not been touched.

The Fannie Brown lay at anchor off Body island, before being taken in tow by the Victoria J. Peed, from Sunday to Thursday in the condition which has been described. During that time, though there was occasionally a pretty heavy sea from the eastward, yet the wind was from the north, blowing down the coast, sometimes a little to west of north, of a character to produce a sea more or less smooth where the Fannie Brown was lying at anchor. There was a pretty strong wind and heavy sea on Wednesday night, which was the night in which the Peed was going from Norfolk to the relief of the Fannie Brown; but this wind was from the north, along-shore, and was not fraught with danger to a vessel lying at anchor at Body island; certainly not with any danger to compare with what would attend a gale from the east, and a heavy sea breaking in from the east upon the shore.

There were in the vicinity of where the schooner lay two shoals, the Platt and the Wimple, which were unknown to Capt. Sharrett, and which, although there are several feet of water on them, are very dangerous to vessels which may become enveloped in the breakers which they produce in heavy seas coming in from eastward. The object of Capt. Sharrett in casting anchor off Body island, and remaining there as he did, was —*First*, to get ready to return to Baltimore for new spars and for repairs; and, *second*, to "wait till the sea ran down," and then to pass out to sea, if necessary, or return to Baltimore when conditions of weather and sea should permit. Hardcastle, the mate, who is more candid than Sharrett, says their intention was to stay there until the wind came around to the southward, and to then come to Baltimore to repair. With reference to this object, it may be stated here that such a wind as they had been looking for in vain for four days did not come for several days after Thursday, the 6th, when the Fannie Brown left the place. For 48 hours subsequent to noon on Thursday the wind was either right down the beach, or a storm from north-east, and, Capt. Sharrett says, was

not such that would have permitted his coming up to Baltimore with
sails. He says that if he had not been taken in tow he should have had
to remain where he was or gone off shore, which latter he says he would
have done "when the sea ran down."

In point of fact, within the 48 hours just mentioned, there occurred
one of the most severe eastern storms that had been known during the
season, in which the German ship Elizabeth, anchored off the beach a
few miles south of Cape Henry, dragged her anchor, was beached, and
was a total loss, with all on board. This disaster occurred on Friday
night, the 7th, in a storm that prevailed along the whole coast from Cape
Henry to the south beyond Hatteras. The Fannie Brown would have
been at anchor, and would have been struck by that storm, if she had
not been taken in tow and brought into Norfolk harbor at 2 o'clock P. M.
of the Friday on the night of which the storm occurred. Witnesses, ex-
amined on the probabilities of what would have happened to the Brown
if she had been still at anchor off Body island on that night, differ in
opinion. Capt. Stoddard, Capt. Nelson, Capt. French, all interested wit-
nesses, but skillful and experienced seamen, think it highly probable that
she would have shared a like fate to that which overtook the Elizabeth.
Mr. Jellison, mate of the Peed, a disinterested witness, but sympathiz-
ing with the libelants, is of the same opinion. The libelants had a very
staunch two-masted wrecking schooner out in those waters on that Fri-
day night, the Annie Collins. She had been out for several days trying
unsuccessfully to get in the capes, and into her home port at Norfolk. She
was off Body island, out at sea, that night. Her master, Capt. Calcott,
who is a disinterested witness, though sympathizing with libelants, says
that on Wednesday night the wind was north; on Thursday night, north-
west; and on Friday and Saturday nights and Sunday (the 9th) was
north-east. He says that the worst nights were those of Friday and
Saturday. He says that, with north-west wind, you may have a sea
as smooth as a mill-pond on Body Island beach, but that a north-east
wind is different; that you must then get away from the shore, and that
you can't stay there. He thinks that if the Fannie Brown had encoun-
tered off Body island the wind and sea which he encountered out at
sea off that beach on Friday night, with her masts and sails as they were,
she would have broken her cable, and been lost. He had 16 men man-
ning the Annie Collins at the time she was out at sea as mentioned; and
from Wednesday night, the 5th, until the following Sunday, he was
trying to get into the capes, but could not. *Per contra*, Capt. Sharrett
and his mate, Hardcastle, interested witnesses, insist that the Fannie
Brown could have weathered the storm of Friday night; and respondents
put on the stand Capt. Wiltbank, an experienced seaman, and disinter-
ested, who has been a master of vessels for 10 or 15 years, who has had
much experience on the coast between New York and southern points,
Wilmington, Savannah, and New Orleans, who for 8 years has been
master of a three-masted schooner, and who, on many occasions, has been
exposed to violent gales on the coast between Hampton roads and Cape
Hatteras. Capt. Wiltbank says that a vessel in the condition in which

the Fannie Brown was, as to masts and rigging, could have ridden safely a storm from the north-east; that the position in which the schooner was lying at anchor was not necessarily dangerous; and that the coast along there, with proper precautions, is not dangerous at all to a vessel at anchor or under sail. He says that he has been at anchor off Charleston, and that he thinks that in any eastern gale a vessel ought to be safely at anchor off Body island. He says that he would not hesitate to anchor anywhere on that coast. He had no idea where the Platt shoal is.

While the Fannie Brown was lying at anchor off Body island, she was hailed by a Clyde steamer, bound for Baltimore, and replied that she wanted a Baltimore tug. On arriving at Philadelphia, the Clyde steamer reported that the schooner was disabled in her masts, and wanted a tug. This news came to Capt. French, one of the libelants, who was the first to receive it in Norfolk. Capt. French is a wrecking seaman, sometimes acting on his own account, with a wrecking schooner commanded by himself; sometimes acting in conjunction with the tug Nettie, commanded by another professional wrecker, Capt. Cole; and sometimes, in dangerous jobs outside the capes, acting with the aid of the Baker Salvage Company, one of the libelants in this case. On hearing of the situation of the Fannie Brown off Body island, on Wednesday, the fifth January, Capt. French applied at once to the superintendent of the Baker Salvage Company, Capt. Stoddard, proposing a joint enterprise to go to her relief. It was agreed upon accordingly, and the Victoria J. Peed was got ready, and left Norfolk for the outside coast by 9 o'clock of that night. The Peed is a very staunch and powerful wrecking steamer. It was built and is employed for that service. It does not engage in mere towage service, whether on the water within the capes or outside. It was *as* a wrecking steamer that Capt. French applied for the use of the Peed, and that she was engaged on the occasion. Whether this fact was known to Capt. Sharrett does not appear in the evidence. It does appear that Capt. Sharrett knew the Peed, and knew whom she belonged to; that his schooner and himself are from Richmond; that he is familiar by long service in these waters with seamen and shipping belonging here. It does appear that the Baker Salvage Company and its vessels are well known, and their business well understood, by seafaring men who are familiar in these waters.

As before stated, the Victoria J. Peed, Capt. Nelson master, left this harbor on the evening of the fifth January, to go to the assistance of the Fannie Brown, lying at anchor off Body island in a condition supposed to be more or less disabled. The distance from Norfolk is 98 miles. The Peed, moving under a pretty strong wind from the north down the coast, reached Body Island light about 10 o'clock on Thursday morning, the sixth January. The Peed rounded to, and went within speaking distance of the Fannie Brown. As introductory to conversation, French asked those on board the schooner if they had seen anything of the Annie Collins, which has been mentioned. Soon they came to the point of asking whether the master of the schooner wanted assistance. He replied that he wanted to put back to Baltimore, and to be towed within

the capes.    Capt. Sharrett endeavored to settle upon the terms of compensation, but the service was undertaken without agreement as to what the compensation should be.    The Peed sent off a surf-boat, with six men, to aid in getting up the anchor of the schooner.    The Peed furnished a wire cable with which to tow the schooner.    All was made ready in an hour or more, and the two vessels got under way for the capes by 12 M. on Thursday.    They made good speed, and got into the capes by the next morning, Friday, and the Peed was then signaled to take the schooner on up to Norfolk, which they reached at 2 o'clock on Friday.

The owners of the Fannie Brown and the libelants have not been able to agree upon the compensation due for the service which has been described.    A tender of $700 has been deposited in the registry of the court by the respondents.    It appears in evidence that the libelants have been unwilling to accept less than $3,000 as their compensation.

As said at the beginning, the important question is whether the service which was rendered was a salvage service, entitling the salvors to a *bounty* from the court for meritorious conduct in addition to the compensation due them on the ordinary principle of *quantum valebant*.    Salvage is a reward decreed by a court of admiralty for services successfully rendered in saving property from maritime danger, by persons under no obligation of duty to render the services, and who voluntarily enter upon them.    If a ship be the thing saved,—and I shall speak in the sequel only of services rendered to a ship —she must have been in actual danger, and have been delivered from it.    It is immaterial that there should have been risk to the salvors.    If there had been, this circumstance would go to enhance their reward.    It determines the amount of reward, not the character of the service.    But it is essential that the ship should have been in peril, and that she was successfully saved from it.    If the danger was great, the reward may be large and liberal.    If inconsiderable, then the reward should be commensurately meager.    Danger, peril, and a successful deliverance from it, by voluntary effort,—that is what constitutes a case of salvage; and the court apportions the award with reference to the degree of peril, the success of the service, and the circumstances of each particular case.

As to what salvage service is there are some striking cases.    Dr. LUSHINGTON said in the case of *The Charlotte*, 3 W. Rob. 71:

"All services rendered at sea to a vessel in distress are salvage services. It is not necessary that the distress should be actual or immediate, or that the danger should be imminent and absolute.    It will be sufficient if, at the time the assistance is rendered, the vessel has encountered any damage or misfortune which might possibly expose her to destruction if the services were not rendered."

In the case of *The Albion*, Lush. 282, which was a case of salvage by a steam-tug, and in which the tug had been, under a contract of towage, along a dangerous coast before the gale in which the ship fell into distress, got separated from the tug, lost her anchors, and suffered damage to her hawse-pipe, bow-planking, and windlass, Dr. LUSHINGTON, in awarding salvage to the tug which had had the ship in tow, and which assisted the ship after the gale, said:

"The ship was certainly not then in any immediate danger; but, on the other hand, she was on a most perilous coast, the weather was unsettled, and, if a gale had set on to the shore, must have been in considerable danger from the want of sufficient ground-tackle, and the disabled condition of her hawse-pipe and windlass."

Sir ROBERT PHILLIMORE, in the case of *The Aztecs*, 21 Law T. (N. S.) 797, said:

"It certainly is a mistake as to the law of salvage to suppose that, in order to constitute a salvage service, a vessel must be in actual danger at the time when the services are rendered to her. The danger may be probable or imminent, which may warrant the court, according to the varying circumstances of each case, in awarding a salvage remuneration."

As to the amount of reward for salvage service, the law remits that entirely to the discretion of the court, and makes it dependent on the circumstances of each case. Salvage is an amount allowed in excess of mere remuneration for work and labor, on principles of public policy, not only as a reward to the particular salvor, but as an inducement to others to undergo risk and peril in the rescue of property from danger. *The Industry*, 3 Hagg. Adm. 203, 204. One of the ingredients of a salvage service is enterprise in the salvors in going out in tempestuous weather to assist a vessel in distress. *The Clifton*, 3 Hagg. Adm. 117.

Chief Justice MARSHALL said, in the case of *The Blaireau*, 2 Cranch, 266:

"If we search for the motives producing the apparent prodigality [of the admiralty courts] in rewarding [salvage] services rendered at sea, we shall find them in a liberal and enlarged policy. The allowance of a very ample compensation for these services, one very much exceeding the risk encountered and labor employed in effecting them, is intended as an inducement to render them, which it is for the public interests, and for the general interests of humanity, to hold forth to those who navigate the ocean."

It is laid down, however, by Judge STORY in the case of *The Emulous*, 1 Sum. 216, that too much weight is not to be given to danger that might have overtaken a ship if the salvage services had not been rendered at the time they were given. He says:

"Subsequent perils and storms may enter as an ingredient into the case when they were foreseen, to show the promptitude of the assistance, and the activity and sound judgment with which the business was conducted, but they can scarcely avail for any other purpose."

I think these citations from the judgments of as enlightened jurists as are known to the admiralty jurisprudence sufficiently indicate the law which governs the case under consideration. It is undeniable that the Fannie Brown was in danger. She was in a dangerous position, on a dangerous coast, in a very crippled condition, at the most stormy season of the year, nearly a hundred miles from any port. She had been there for four days. If her spars and rigging were in sufficient repair to enable her to stand out to sea, and to wait there for favorable conditions for getting into the capes, she had not shown that they were by trying and trusting to them. She had lain off Body island for two or three days, when the wind was favorable for leaving the dangerous coast, and

getting out into the ocean.   Instead of doing what the Annie Collins, which was a much smaller vessel, did at the time, she lay there, on that perilous beach, for days, "waiting for the sea to run down."   A continued wind, such as had prevailed from the north down the coast, occasionally with a point or two from off shore, was the only sort of wind under which the sea could "run down;" and it had not run down in four days, and the sea itself was as rough from the east on the night of Wednesday, the 5th, as it had been since the schooner had thrown out her anchor there.   No advantage had been taken of the wind from the north to get out to sea.   The failure to take advantage of it at any time in those four days was a demonstration that the Fannie Brown was not in condition as to spars and rigging to get away.   She was helpless in that respect.   She was there *ex necessitate rei*, and it is idle to pretend that an anchorage there, in midwinter, in the weather then prevailing, was a safe anchorage.   To insist upon such a proposition is to trifle with the gravity of the case, and with the intelligence of the court.   The vessel was in a dangerous position, entirely dependent for safety upon her anchor, seriously crippled and disabled, and unable to get away with her sails, except under the most improbable circumstances of chance. Such was the condition of things at sea when report of it reached Capt. French in Hampton roads.

There was no towing tug in these waters capable of going out of the capes, 70 miles down towards Hatteras, on a towing expedition.   It is problematical whether there are towing tugs at Baltimore capable of such an expedition, and available for it.   To go out so far along that coast, in the worst weather of the winter, would have been more than a towing expedition, even for a common towing tug, even after a ship not in danger and distress.   And for a ship in the situation of the Fannie Brown to send word for a tug, and to wait for and expect a tug, so far away from port, out at sea, on a tempestuous coast, in midwinter, was to invite a service superior in grade to one of mere towing.   She was in no condition to predetermine the character of the assistance she called for.   Certainly the libelants, in going out to the schooner with a steamer never used in mere towing service, on a trip which no available towing tug would have ventured upon, went in the character and with the intention of salvors.   The master of the schooner that was waiting for help knew their vessel when it came, knew it was a wrecking vessel, and could not but have known that it came on a salving errand.   His attempts by a proposed contract to degrade the service to one of towage, and to limit the salvage reward by an express stipulation, implied that he was aware of the purpose of the salvors, and of the character of their expedition.

It is useless to show further that this was a salvage service, both in respect to the relations of the libelants to it, and of the respondents.   I have gone into the question more fully than the nature of the case seemed to call for, because there is a growing disposition observable to ignore the meritorious character of the salvage service, and to bring it down, in all possible cases, to the level of mere compensation for days' or hours' work.   This degradation of the service ought not to be countenanced by

a court sitting so near the coast as this does, whereon was wrecked within a short time past the Huron, the Harkaway, the Elizabeth; whereon was lost, on the very day when the salvage service under consideration was completed, a great ship and 25 lives, some of them the lives of heroes engaged in the very act of attempting the hazardous services of voluntary salvors. Salvors are more than common laborers, and their reward is of a character essentially different from wages.

Coming, now, to consider what ought to be the award in the case at bar, I do not find, in its facts and circumstances, much warrant for a high bounty. This court must encourage the sending of prompt and efficient aid to vessels reported to be in distress on the tempestuous and treacherous coast trending each way from the elbows of Hatteras. A niggardly treatment of salvors who promptly go out upon that coast in stormy weather and seasons on such errands would depress the enterprise which prompts such expeditions, and result, not only in large losses of property susceptible of rescue, but in much human exposure and suffering capable of alleviation, and loss of human life that might often be saved. I dare not treat such a subject in such a spirit, and apply a scale of wages to salvage services. I think the compensation of these libelants for mere towage ought to be at least $500. I doubt if any tug would have ventured out on the occasion for that amount. I think the reward should be $1,000. I will sign a decree for $1,500.